Josephine VARGAS, Martin Ellerbee, Marion Gargiulo, Joann Wheeler, Janice Sellers, Maria Rivera, Margarita Gonzalez, Plaintiffs,

v.

Christine CALABRESE, individually and in her capacity as former Chairperson of Hudson County Board of Elections, Frank Caleca, Lee S. Lichtenberger, the Hudson County Superintendent of Elections, Harvey L. Birne, as Hudson County Superintendent of Elections, Gerald McCann, individually and in his official capacity as former Mayor of the City of Jersey City, Matthew Burns, John Finn, Mark Munley, Defendants.

Gerald McCANN, Mark Munley, John J. Finn, Matthew Burns, Defendants/Third-party Plaintiffs,

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Third-party Defendant.

Gerald McCANN, Defendant/Third-party Plaintiff,

v.

J.R. INSURANCE BROKERAGE, INC., Third-party Defendant.

Civ. A. No. 85–4725.

United States District Court, D. New Jersey.

Nov. 9, 1990.

As Amended Nov. 14, 1990.

Juan Cartagena, Law Office of Ignacio Perez, Jersey City, N.J., Dept. of Puerto Rican Community Affairs, New York City, Samuel Issacharoff, University of Texas Law School, Austin, Tex., Ruben Franco, Arthur Baer, Ken Kimerling, Puerto Rican Legal Defense & Education Fund, New York City, Frank R. Parker, Lawyers Committee for Civ. Rights Under Law, Washington, D.C., and Seth Kreimer, Philadelphia, Pa., for plaintiffs.

Arthur L. Porter, Jr., Brach, Eichler, Rosenberg, Silver, Bernstein, Hammer & Gladstone, Roseland, N.J., for defendants Harvey L. Birne, Hudson County Superintendent of Elections.

William J. Prout, Jr., Ellen Nunno Corbo, George Gerard Campion, Richard A. Roche, Tompkins, McGuire & Wachenfeld, Newark, N.J., for defendants Gerald McCann, Mark Munley and Matthew Burns.

Clifford A. Herrington, Margulies, Wind, Herrington & Katz, Jersey City, N.J., for Hudson County Bd. of Elections.

David Dembe, Deputy Atty. Gen., Robert J. Del Tufo, Atty. Gen. of New Jersey, Dept. of Law & Public Safety, Trenton, N.J., for Atty. Gen. of New Jersey.

## OPINION

DEBEVOISE, District Judge.

The matter is now before the Court upon plaintiffs' application for attorneys' fees pursuant to 42 U.S.C. § 1988. Before addressing the contentions of the parties it is necessary to summarize the history of this case.

## A.  PROCEDURAL BACKGROUND

Plaintiffs, who are registered voters of Jersey City, filed the complaint in this action seeking declaratory relief and monetary damages on behalf of a proposed class consisting of all registered black and Hispanic voters in Jersey City. It was alleged in general that during the June 11, 1985 municipal run-off election persons favoring mayoral candidate Gerald McCann had conspired with each other and had engaged in a number of activities designed to discourage or prevent black and Hispanic registered voters from voting. A more specific description of these alleged activities is set forth in a 1986 Opinion, *Vargas v. Calabrese*, 634 F.Supp. 910 (D.N.J.1986).

The original defendants were the four members of the Hudson County Board of Election; Joseph Brady, the Hudson County Superintendent of Election; candidate McCann; six named District Election Board members individually and on behalf of all District Election Board members; and twelve named challengers individually and on behalf of all McCann challengers. Plaintiffs voluntarily dismissed the District Election Board members and challengers. After discovery was undertaken plaintiffs were given leave to add as defendants three McCann campaign workers—Matthew Burns, John J. Finn and Mark Munley.

On October 8, 1985, fearing a repetition of the events of the previous June, plaintiffs moved for a preliminary injunction requiring the Hudson County election officials to take steps to protect the voting rights of minority voters in the upcoming gubernatorial election. On October 1, 1985, after a hearing, I signed a consent order specifying rather elaborate election procedures agreed to by the parties. Subsequently, the Attorney General of the State of New Jersey moved to intervene in his own behalf.

Plaintiffs moved for certification of the plaintiff and defendant classes. They moved for summary judgment against the defendants for violation of (1) the First Amendment, (2) the Voting Rights Acts of 1965 and 1957, (3) the Civil Rights Act of

1866, 42 U.S.C. § 1985, and (4) the Fourteenth and Fifteenth Amendments. New Jersey's Attorney General moved for summary judgment on the challenged constitutionality of four New Jersey election laws.

I denied plaintiffs' motion for summary judgment on the ground that there were contested issues of material fact. I certified a plaintiff class. I denied plaintiffs' motion to certify defendant classes, finding that there was no assurance that the class members would have common defenses or that the class representatives would provide adequate representation. Further, I was deeply concerned about the chilling effect such a certification would have upon the legitimate exercise of political rights by citizens of this country. I granted the Attorney General's motion for summary judgment on Counts One, Two and Six of the complaint which challenged the four provisions of New Jersey's election laws. The reason for these rulings are set forth in the opinion cited above.

Very intensive discovery was undertaken by all parties, and numerous motions were filed and argued. During the course of the proceedings I granted summary judgment in favor of Hudson County Board of Election members Christine Calabrese, Frank Caleco, Lee S. Lichtenberger, and Julius D. Canter. Hudson County Superintendent of Election Joseph Brady died and he was dismissed from the case in his individual capacity. Substituted in his place in an official capacity only was his successor, Harvey L. Birne. I denied McCann's motion for summary judgment.

An important subsidiary issue, in which the plaintiffs were not directly involved but which had an important bearing on the monetary recovery which they could expect to obtain, was whether defendants Burns, Finn, Munley and McCann were covered by a comprehensive general liability insurance policy which third-party defendant National Union Fire Insurance Company of Pittsburgh, PA ("NUFI") had issued to the McCann campaign organization. In June, 1989 I concluded that the policy provided coverage with respect to the claims asserted against these four individuals in the instant case. *Vargas v. Calabrese,* 714 F.Supp. 714 (D.N.J.1989).

For a considerable period of time both before and after my decision on the claims against NUFI the parties engaged in settlement discussions while simultaneously filing substantive motions, completing discovery and making final preparations for trial.

Plaintiffs settled with the four individual defendants who, in plaintiffs' judgment, had varying degrees of responsibility for the untoward events which occurred before and during the June 11, 1985 run-off election.

The first to settle was John J. Finn. That settlement did not involve the payment of any money by Finn to plaintiffs.

In 1988 Matthew Burns completed negotiations of a settlement agreement with plaintiffs. The agreement provides that he is to pay $45,000 in any event, and if it is ultimately determined that the insurance policy covers the claim, he will be obligated for a total amount of $90,000.

Gerald McCann was the principal defendant, having the greatest exposure to an adverse judgment, and the next most vulnerable defendant was Mark Munley. McCann and Munley each agreed to refrain from the kind of conduct which was the subject of the complaint and each agreed to pay damages in the amount of $250,000 and, in recognition of the contingent nature of that recovery, to assign to plaintiffs 25% of any net recovery in bad faith punitive damages he collects from NUFI and to assign to plaintiffs' counsel 25% of any such net recovery. The assigned sums will be in addition to any amount plaintiffs may recover on their own application for attorneys' fees and costs.

During the course of proceedings in which NUFI's liability was determined I held that under the circumstances of this case bad faith and punitive damages cannot be collected from NUFI and therefore, unless I am reversed on appeal, the agreement to assign a total of 50 percent of bad faith recoveries is a nullity.

Under the settlement agreements with McCann and Munley the $250,000 payments are totally contingent on NUFI's being liable for them. Under the settlement agreement with Burns, $45,000 of the $90,000 payment is similarly contingent. This issue is being raised on appeal and to the extent that the Court of Appeals finds that NUFI is not obligated to provide coverage to McCann, Munley and Burns for these sums, those individuals will be relieved of their obligation to pay plaintiffs.

The settlement funds are to be distributed to the class plaintiffs pursuant to a plan described in a memorandum which was incorporated in the final judgment.

The public defendants, namely the Hudson County Board of Elections and Harvey L. Birne, Superintendent of Elections, also entered into settlement negotiations with plaintiffs. This resulted in injunctive provisions designed to ensure that members of the class (and, incidentally, other voters as well) would not be deprived of their right to vote through inappropriate methods of challenging. Procedures were established for establishing residency and to assist Spanish-speaking voters. Many of the procedures incorporated in the October 1985 consent decree became a part of the final decree and other provisions were added. Prior to its acceptance the Attorney General of New Jersey reviewed the terms of the proposed settlement to ensure that it did not violate the New Jersey Election Laws. The public defendants did not agree to pay damages.

The settlements with the various defendants resulted from negotiations which were intensive and prolonged. The question of attorneys' fees was deferred until after approval of a settlement on the merits. Agreement in principle between plaintiffs and McCann, Munley and the public defendants was arrived at on October 30, 1989. During November there were intensive efforts by the attorneys drafting the decree, the settlement agreement and the separate agreements with McCann and Munley. By December 5, 1989 all settlement papers had been signed and thereafter notice of a hearing on approval of the settlement was given. After the hearing on January 8, 1990 I approved the settlement as fair, reasonable and adequate and in the best interest of the members of the class. I refer to two opinions which I read into the record on that date for a statement of my reasons for approving the settlements.

On January 8 I left open the question whether NUFI was liable to Burns, McCann and Munley for the sums which they agreed to pay and for attorneys' fees which might ultimately be recovered against them. On January 23, 1990 I held a hearing on that question. In a March 5, 1990 bench opinion I held as follows: (i) under applicable insurance law, the monetary settlements in the amounts of $90,000 and $250,000 aggregating $590,000 are reasonable and represent compensatory and not punitive damages; (ii) NUFI must indemnify the four individual defendants for these sums and for the attorneys' fees which plaintiffs recover against the individual defendants; (iii) NUFI is entitled to a deductible in the maximum amount of $100 with respect to each class member's claim against the total settlement fund of $590,000. Thereafter rather extensive proceedings were held to determine the amount which NUFI owed to the individual defendants on account of their attorneys' fees and disbursements in this case. NUFI is appealing these determinations both as to its liability and as to the amount of its liability.

Thus the net result of all of plaintiffs' efforts has been to obtain substantial injunctive relief for black and Hispanic voters which should ensure that members of the class will not again suffer the indignities and the hindrances to and deprivation of their right to vote, preventing a recurrence of the June 1985 election and election campaign events. The decree includes requirements of affirmative actions by election officials to assist voters and in particular to facilitate voting by Spanish-speaking individuals.

In addition, the settlement provides for the payment of significant damages to members of the class, contingent upon

NUFI being responsible to the individual defendants for a major portion of those damages. The contingent nature of the damages portion of the settlement is a realistic reflection of the abilities of these individuals to pay substantial sums from their own resources.

## B. THE ATTORNEYS' FEE APPLICATION

Plaintiffs submitted an application and a supplemental application setting forth the hours of each attorney, paralegal, law clerk and student. The hours and rates described below are based upon those documents. I asked plaintiffs to submit a schedule showing the years in which the services were performed, and in the course of preparing that schedule plaintiffs discovered a few relatively minor errors in the hours of six persons. The corrected figures are reflected in Appendix A to this opinion. The attorneys' fee award is based upon the Appendix A figures.

Plaintiffs' attorneys seek a total of $1,030,274.51 by way of attorneys' fees and disbursements. This total sum is derived as follows:

| | |
|---|---|
| Lodestar for Attorneys | $ 479,648.60[1] |
| Enhancement | 469,378.60[2] |
| Law Students/Clerks | 42,087.30 |
| Expenses | 38,420.01 |
| Total | $1,029,534.51 |

The attorneys, paralegals, law clerks and students who worked on the case on behalf of plaintiffs, the hours each worked and the hourly rates at which they seek compensation are as follows:

| Attorney, etc. | Hours | Rate | Lodestar |
|---|---|---|---|
| Juan Cartagena | 1288.75 | $180 | $231,975.00 |
| Samuel Issacharoff | 1245.6 | 160 | 199,296.00 |
| Lauren Anderson | 60.2 | 135 | 8,135.10 |
| Arthur Baer | 277.14 | 125 | 34,642.50 |
| Patricia Hanrahan | 44.8 | 125 | 5,600.00 |
| Lucia T. Gill | 16.7 | 40 | 668.00 |
| Barry J. Fisher | 127.5 | 40 | 5,100.00 |
| Emily Epstein | 171.4 | 40 | 6,856.00 |
| Norberto Caballery | 108.77 | 40 | 4,350.80 |
| Pauline Daniels | 5.5 | 40 | 220.00 |
| Miguel Terc | 31.25 | 40 | 1,250.00 |
| Blair Bernholz | 125.4 | 50 | 6,270.00 |
| David Schanzer | 35.0 | 50 | 1,750.00 |
| Robert M. Wilkinson | 10.2 | 50 | 510.00 |
| Marvin Krislov | 5.5 | 50 | 275.00 |
| Kristen F. Bauer | 115.2 | 50 | 5,760.00 |
| Ron Lopez | 24.9 | 50 | 1,245.00 |
| Hiram Marrero | 88.25 | 50 | 4,412.50 |
| Javier Vargas | 60.0 | 50 | 3,000.00 |
| Alexander Ho | 10.5 | 40 | 420.00 |
| TOTAL | | | $479,648.60 |

---

Those persons listed above for whom compensation is sought at the rate of $40 per hour are paralegals, except for Alexander Ho, who is listed as a clerk. Those for

---

1. This figure corrects an error in addition which appears at page 2 of plaintiffs' original application. Adding the lodestar figures for five attorneys yields $469,378.60, not $469,748.60 as set forth in the application—a $370.00 difference.

2. Plaintiffs filed an original application seeking $469,748.60 (now corrected to $469,378.60) as the attorney lodestar figure. They also sought a 100% enhancement. On September 21, 1990 plaintiffs filed a supplemental application in which they sought $10,270 as an additional attorney lodestar figure. They do not seek an enhancement with respect to that amount.

whom compensation is sought at the rate of $50 per hour are listed as law students or clerks.

Mr. Cartagena is a 1981 graduate of Columbia Law School. From August 1981 to April 1988 he was a staff attorney for the Puerto Rican Legal Defense and Education Fund. From May 1988 to December 1989 he was associate counsel of the Community Service Society of New York and from January 1990 to the present he has been legal director of the Commonwealth of Puerto Rico's Department of Puerto Rican Community Affairs in the United States. During that period he has litigated numerous civil rights cases involving claims of the Puerto Rican community; he has written numerous articles; he has served on the boards of many organizations devoted to the cause of protecting rights of Hispanic Americans.

Mr. Issacharoff graduated from Yale Law School in 1983, having served there as an editor of the Yale Law Journal. He served a judicial clerkship with the Honorable Arlin M. Adams, Judge of the United States Court of Appeals for the Third Circuit. He became a lecturer in Law at the University of Pennsylvania Law School, teaching employment and civil rights law from January 1985 until the summer of 1989 when he became an Assistant Professor at the University of Texas Law School. During the period while he was teaching he also served as Acting Director and staff attorney of the Voting Rights Project of the Lawyers' Committee for Civil Rights Under Law, worked with a private law firm and participated in a number of complex cases, including voting rights and other civil rights cases.

Ms. Anderson is a 1977 graduate of Rutgers Law School. In that year she became director of New Jersey Civil Liberties Union's Prisoners' Rights Organized Defense Project. In 1978 and 1979 she was a staff attorney with the New York City Board of Corrections. In 1981 she taught an undergraduate course in juvenile law at Rutgers College. From 1979 into 1982 she was Associate Director of the National Conference of Black Lawyers, and from 1982 into 1986 was a staff attorney with the ACLU's Children's Project. From 1986 into 1989 she was project manager of Jersey City's Department of Housing and Economic Development and from 1989 to the present she has been associated with a law firm.

Mr. Baer graduated from Harvard Law School in June 1986 and from September 1986 to September 1987 he clerked for the Honorable Jay A. Rabinowitz, Chief Justice of the Supreme Court of Alaska. From October 1987 until September 1988 he was associated with a New York City law firm specializing in labor law. In 1988 he joined the Puerto Rican Legal Defense and Education Fund, Inc. as an associate counsel, a post he continues to hold.

Ms. Hanrahan graduated from Antioch Law School in 1980. From 1982 until the summer of 1986 she was a staff attorney with the Voting Rights Project of the Lawyers' Committee for Civil Rights Under Law. There she developed special skills in Federal voting rights cases and participated in a number of complex Section 2 voting rights cases. In 1986 and 1987 she was associated with a Washington, D.C. law firm. She is now Director of the ABA's Representation of the Homeless Project in that city.

## C. PREVAILING PARTY

In order to be entitled to an award of attorneys' fees under any of the fee award statutes involved in this case plaintiffs must be prevailing parties. A plaintiff prevails where it has succeeded on any significant issue in the litigation which achieves some of the benefits the parties sought in bringing the suit. *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). On the other hand, time spent on distinct claims determined adversely to plaintiffs should not be compensated. *Hensley,* 461 U.S. at 436–441, 103 S.Ct. at 1941–1943.

Plaintiffs have not requested compensation for time spent on three specific issues: (i) the motion for certification of a defendant class, (ii) the motion to certify the judgment granting defendant Calabrese summary judgment and (iii) the motion to

vacate the order of February 22, 1988 granting summary judgment to defendants Calabrese, Lichtenberger and Caleca and granting partial summary judgment to defendant Canter. Thus 12.5 hours of time of Mr. Cartagena and 12.5 hours of time of Mr. Issacharoff are not included in the fee requests.

■ Without making a finding upon the necessity of deleting those hours, I believe that there was an issue which was sufficiently discrete and upon which plaintiffs did not prevail which should not enter into the fee calculations. As recited above, Counts One, Two and Six of the complaint challenged four provisions of New Jersey's election laws. The New Jersey Attorney General intervened in order to defend those laws, and on cross-motions for summary judgment he prevailed and was able to remain inactive until final settlement of the case. Plaintiffs did not prevail on that claim and should not be compensated for their efforts with respect to it.

It appears from plaintiffs' papers that the motions which dealt with that issue and with several other important issues were handled by Mr. Issacharoff and his associate, Ms. Hanrahan. It also appears that work on these motions and the argument thereon took place in February 1986. Mr. Issacharoff spent 49.1 hours on the motions and Ms. Hanrahan spent 18.1 hours on them. A reasonable allocation of time attributable to the issue of the validity of the New Jersey election laws is 25%. Thus 12.3 hours of Mr. Issacharoff's time and 2 hours of Ms. Hanrahan's time will be deducted because plaintiffs did not prevail on that claim.

Except for that issue plaintiffs must be deemed to have prevailed on all other issues. It is true that summary judgment was granted in favor of certain individual defendants in their individual capacities, but each of those defendants played a significant role in the election process which the remaining individual defendants had so grievously abused; the testimony of each was essential in order to ascertain what had happened; and as long as they hold official positions the injunctive provisions will be directed against them in their official capacities.

## D. DUPLICATION OF EFFORT

Even though the list of attorneys, paralegals, students and law clerks is so long as to suggest an army of litigators brought into this fray to overwhelm the opposition, these appearances are deceptive. A reduction for duplication of efforts is required where attorneys are unreasonably doing the same work. *Rode v. Dellarciprete*, 892 F.2d 1177 (3d Cir.1990). There is some unwarranted duplication in the present case, for which an adjustment will be made, but the amount of duplication is not as extensive as the array of personnel suggests.

There were essentially two legal centers providing representation to the plaintiffs during most of the time period involved in this case—(i) The Puerto Rican Legal Defense and Education Fund (the "Defense Fund") from which Mr. Cartagena worked until some time in 1988 and (ii) the Voting Rights Project of the Lawyers' Committee for Civil Rights Under Law (the "Voting Rights Project") from which Mr. Issacharoff worked.

The Defense Fund is located in New York. Mr. Baer joined it in 1988 shortly after Mr. Cartagena started working with the Community Service Society of New York. Some of the paralegals, law clerks and students worked for the Defense Fund, most for only a brief period during the course of the present case.

The Voting Rights Project is located in Washington, D.C. Ms. Hanrahan was affiliated with it during 1985 and 1986 when she worked on this case. Eight of the paralegals, law clerks and students worked for the Voting Rights Project, all for brief periods.

Messrs. Cartagena and Issacharoff provided the leadership in this case and they and their supporting staffs did the vast bulk of the work. In a case of this magnitude, were it being handled by private attorneys, the plaintiffs could reasonably draw upon the services of two law firms,

and the conferences and communications between the lawyers in those firms, like the conferences and communications between lawyers in a single firm, would not constitute unreasonable duplication of work.

The other personnel working on this case who were not a part of the two lead organizations were useful adjuncts whose work was coordinated with the work of the principal actors. Ms. Anderson's services were performed only in 1985. She was employed at the American Civil Liberties Union and played a useful role meeting with potential witnesses and plaintiffs and performing services in the locality where the untoward events had taken place.

Two of the paralegals, students and/or law clerks worked with the Community Services Society when Mr. Cartagena was affiliated with it and they were in a position to assist him with the case.

The only area of significant duplication which I perceive is the use of Voting Rights Project personnel other than Mr. Issacharoff to perform services in the New York area and to attend depositions and court hearings. There was an ample number of supporting personnel in the New York–New Jersey area and thus it was unnecessary to bring Washington based people here. Similarly, one or more New York based attorneys attended the depositions and hearings and it was unnecessary to bring more than one person from Washington.

For that reason the 20.6 hours which Ms. Hanrahan spent traveling to and from Newark or New York City, attending court hearings and meeting Defense Fund personnel and clients will be disallowed. The 5.5 hours which Mr. Krislov spent attending "Deposition with Sam [Issacharoff]" will be disallowed. The 23.0 hours which Ms. Bauer spent traveling to and from New York and attending a deposition will be disallowed.

### E. REASONABLE NUMBER OF HOURS

Apart from the hours noted in Parts C and D above, I find that the hours set forth in the application were reasonably expended in the prosecution of this case. The required reduction from the hours listed in part B are as follows:

Mr. Issacharoff's time will be reduced by the 12.3 hours devoted in 1986 to the New Jersey election law claims, leaving 1233.3 compensable hours.

Ms. Hanrahan's hours will be reduced by the 2 hours devoted in 1986 to the New Jersey election law claims, by the 8.6 hours devoted to activities in the New York City area in 1985 and by the 12 hours devoted to attending a Newark hearing and traveling in 1986, leaving 24.2 compensable hours.

Mr. Krislov's 5.5 hours spent attending "deposition with Sam" in 1986 will be disallowed, leaving no compensable hours.

The foregoing hours have been deducted in order to arrive at the number of hours shown in Appendix A. In Appendix A the hours have been corrected to show whole numbers.

### F. RATES OF COMPENSATION—LODESTAR—DELAY

Having determined the number of hours reasonably expended on the litigation it is necessary in order to compute the lodestar to decide a reasonable hourly fee which may be charged by each person rendering the services.

The services in the case were rendered during each of six years. The compensation rate for this entire period suggested by plaintiffs is the hourly rate which each person could reasonably charge in 1990. I do not believe that such an approach is appropriate in this case where the services were rendered over such a substantial period of time. In the first place the principal attorneys are relatively new to the profession. By 1990 they had reached a level of great skill and expertise, but they were in the process of reaching that level during the period in question, and consequently during earlier years this rate of compensation would have been considerably less than it is today. Further, attorney fee rates have been increasing during the 1985–1986 period. Persons of equal skill

and experience would have commanded a lower hourly rate in 1985 than they would in 1990.

It is true that there has been a delay in payment. That, however, may be taken into account by making a separate award for delay, a factor separate and distinct from a contingency award. *Institutionalized Juveniles v. Secretary of Public Welfare,* 758 F.2d 897 (3d Cir.1985).

Based on the experience and expertise of the various attorneys involved, I conclude that reasonable hourly rates for the pertinent years are the following:

|                     | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 |
|---------------------|------|------|------|------|------|------|
| Juan Cartagena      | 100  | 120  | 130  | 140  | 150  | 160  |
| Samuel Issacharoff  | 90   | 105  | 120  | 135  | 150  | 160  |
| Lauren Anderson     | 100  | N/A  | N/A  | N/A  | N/A  | N/A  |
| Arthur Baer         | N/A  | N/A  | N/A  | 100  | 125  | 125  |
| Patricia Hanrahan   | 100  | 110  | N/A  | N/A  | N/A  | N/A  |

The affidavits of services of the paralegals who worked for the Voting Rights Projects each stated "that an hourly rate of $35 is an appropriate recovery for my time." However, a recovery of $40 is sought for all paralegals. The $40 rate is reasonable for the years 1988–1990; a $35 rate is reasonable for the year 1985–1987.

Plaintiffs seek $50 an hour for clerks and students. That rate is reasonable for the years 1988–1990; a $40 rate is reasonable for the years 1985–1987.

In order to compensate for delay, an interest rate of 10% per annum (not compounded) will be awarded for the fees earned during the years 1985 through 1989. Thus a fee earned in 1985 will be entitled to an additional 10% of that sum multiplied by the five succeeding years during which it was not paid. Thus if Attorney A's 1985 lodestar was $2,500, there would be an additional sum owing in the amount of $1,250 to compensate for the delay in payment.

Appendix A to this opinion is a table which sets forth each attorney's and each other person's lodestar for each of the years 1985–1990 and which also sets forth the award for delay in payment applicable to each lodestar figure. As will be observed from the table, the total lodestar figure is $400,200.00 and the total sum which should be awarded on account of delay in payment is $101,971.00.

## G. CONTINGENCY MULTIPLIER

The question whether a contingency multiplier should be awarded is governed by the Supreme Court decision in *Pennsylvania v. Delaware Valley Citizens Council for Clean Air,* 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) (Delaware Valley II), and by the Third Circuit decision in *Blum v. Witco Chemical Corp.,* 888 F.2d 975 (1989).

The risk enhancement must be necessary to attract competent counsel. The compensation for contingency must be based on the difference in market treatment of contingent fee cases as a class, rather than on an assessment of the riskiness of the particular case. The burden rests upon the plaintiff to demonstrate the amount of extra compensation required to attract competent counsel in "all contingency cases in a given geographic market." *Blum* at 981, quoting *Delaware Valley II.*

Defendants in this case have shown that plaintiffs had no trouble whatsoever in attracting competent counsel. In fact, highly competent counsel from the organizations sponsoring this case sought out the class plaintiffs and persuaded them to pursue this lawsuit. This is a typical high visibility lawsuit which provides public interest legal groups with an opportunity to advance the causes they support. Thus in this case as in many such cases, the prospect of a contingency multiplier would not have been necessary to obtain legal repre-

sentation. Defendants urge this circumstance as a reason to deny a multiplier.

■ As I understand the applicable law, however, the ability or inability of a plaintiff to obtain counsel in a particular case is not determinative of the question whether a fee award for contingency should be made. Instead, there must be a "focus on the class of [contingent] cases, as opposed to the risks of the individual case at issue." *Blum* at 981 quoting *Delaware Valley II.*

It would appear that all kinds of contingent cases in the geographical market must be considered—antitrust and securities fraud class actions, professional liability cases, products liability cases, automobile negligence cases, other personal injury cases, civil rights and employment discrimination cases of all kinds which are handled on a contingent basis. Despite the vast differences in the circumstances which govern each of these different categories of contingent fee cases, somehow they are to be analyzed in their entirety and there is to be derived therefrom a contingency multiplier "which would be applicable to future litigation within the same market." *Blum* at 982. We are not concerned here with the wisdom or rationality of this approach. For the moment, at least, it represents governing law and must be applied as best we can.

*Blum* suggests that the proper multiplier may be derived either from preparation of some kind of econometric model or from the opinions of persons having wide experience in contingency fee matters. The former route would undoubtedly involve a battle of experts who, given the extraordinary number of variables involved and the gauzy nature of most of them, could produce voluminous studies and a variety of opinions, the trial of which could consume weeks of court and attorney time, leaving the court with about as much authoritative guidance as it had at the outset.

Wisely, no parties to the present proceedings pursued that route. Plaintiffs relied upon attorneys with extensive experience in the kinds of lawsuits in which plaintiffs' attorneys usually receive contingent fees. Each side presented the affidavit of an economist. From this evidence I conclude that a multiplier is necessary to induce competent attorneys to provide representation, and I believe that the evidence enables me to fashion the appropriate multiplier.

Plaintiffs' attorneys themselves and approximately nine other attorneys have submitted affidavits stating that in the kinds of cases he or she primarily engages, fees are generally on a contingent basis and that a multiplier is required to induce attorneys to take an such cases. The attorneys who gave their affidavits engaged in varying specialties—voting rights and civil rights litigation, personal injury cases, class action cases, employee discharge and discrimination cases.

Plaintiffs' attorneys did not state what the minimum multiplier should be to attract competent attorneys. However, since they are requesting a multiplier of twice the lodestar, I infer that a multiplier of two is what they believe the appropriate multiplier to be.

Some of the other attorneys stated the amount by which their compensation in contingent cases exceeded their hourly rates. For example, Alan Y. Medvin, past president of New Jersey ATLA states that he charges up to $200 on an hourly basis but when he is successful in a contingent fee case he receives the equivalent of $500 to $2000 per hour, i.e., a multiplier of 2½ to 10.

None of the other attorneys who filed affidavits even approached a multiplier of that size and those figures are of no evidential value in determining the multiplier required to attract competent counsel.

Several of the attorneys submitting affidavits suggested multipliers which they commonly received. A multiplier of 1.5 was noted by an attorney handling employee civil rights actions; an attorney engaged in a general contingent fee practice stated that a multiplier of at least 2 represented his contingent fees over the years; one attorney cited a state court award in an employment case based on a multiplier of 1.4 to an attorney who had worked on the case for four and one-half years, with no

multiplier being applied to the fee of an attorney who recently had entered the case.

The affidavit of Charles Silver, an Assistant Professor of Law at the University of Texas Law School, was helpful. He teaches courses on civil procedure, remedies and current topics in litigation including attorneys' fees. He is the author of an article on attorneys' fees in class actions. Generally, he opined that a multiplier in contingent fee cases is both fair to litigants and attorneys and necessary to attract attorneys in civil rights cases. The premium is necessary to offset the risk of non-payment. An appendix to Professor Silver's affidavit sets forth the multiplier used by the court in nine cases. The multiplier ranged from 1.25 in two cases to 3 in one case and 2 in three cases.

In most, if not all, of the affidavits submitted by plaintiffs, the multiplier was designed to compensate for both the risk of loss and the delay factor.

In addition plaintiffs submitted the affidavit of an economist, Frank D. Tinari, Ph.D. The affidavit was prepared for use in another case, but that does not render it useless in this case, because the multiplier is not designed to reflect the circumstances of the particular case. Rather, it is designed to reflect a multiplier of sufficient magnitude to induce competent attorneys to undertake all kinds of contingent cases in the geographic market.

Dr. Tinari developed a questionnaire directed to the four pertinent factors suggested in *Rode v. Dellarciprete, supra.* He conducted a telephone survey of twelve recognized practitioners in the area who were knowledgeable about contingent fees. Those responding gave as reasons for the necessity of awarding a premium in contingent fee cases the delay in payment and, primarily, the risk of potential loss.

As for the minimum amount of the multiplier required to attract competent counsel, the responses were:

| Minimum Multiplier | Number of Respondents |
| --- | --- |
| 1.5 | 2 |
| 2 | 4 |
| 3 | 2 |
| 1.5 to 2 | 2 |
| 1.5 to 3 | 1 |
| 1.75 to 2 | 1 |

Based upon the data he assembled Dr. Tinari opined: "It is absolutely clear that the market judges a minimum reasonable multiplier to be two (2) times the average hourly fee. Another way of putting this is that the multiplier must be at least one-hundred (100) percent of the hourly fee to attract competent counsel." The data upon which Dr. Tinari relied shows that his multiplier is designed to compensate for both risk of loss and all that entails and delay in payment.

Defendants submitted a report of R. Joseph Schlosser, Ph.D, an associate of Coopers & Lybrand and a specialist in economics and econometrics.

He offered three criticisms of Dr. Tinari's opinion.

The first related to the market which Dr. Tinari utilized. Dr. Schlosser noted that the present case is a high profile civil rights proceeding which "has a high probability of having distinctive market characteristics that establish this market as separate from all contingency cases. The market characteristics for this case were not considered by Dr. Tinari in his contingency multiplier opinion. In fact, he failed in his questionnaire to ask if the subclasses antitrust, commercial litigation or civil rights litigation might command different multipliers."

In many contexts Dr. Schlosser's observation would be perfectly correct. It seems highly likely that different multipliers would be required to attract competent attorneys in antitrust cases, securities fraud cases, civil rights cases, product liability cases, automobile negligence cases, and so forth. But, as explained previously, that separate kind of inquiry is forbidden in § 1988 attorney's fee cases under present Supreme Court and Third Circuit authority. We are to disregard the peculiar characteristics of the individual cases in which fees are being awarded; we are to disregard the peculiar circumstances of the general class of contingent fee cases of which the individual cases is one; instead we are to put all classes of contingent fee cases in a

blender, stir this mix and decide what minimum multiplier would ensure competent counsel in all kinds of contingent fee cases as a single group. If Dr. Schlosser believes that to be a very problematic assignment, both he and the district courts must bear in mind that we are not to reason why, we are simply to do.

Dr. Schlosser's other two observations have considerable merit. They do not render Dr. Tinari's opinion useless, but simply require that I not rely upon it to the exclusion of the other evidence on the subject. Dr. Schlosser correctly observes that it has not been established that Dr. Tinari's sample is representative of plaintiffs' counsel or that there has been any check on response bias, particularly as it relates to self interest of the respondents. Further, Dr. Schlosser points out that more than 40% of the 12 respondents offered minimum contingency fee multipliers of 1.5 and half the respondents offered multipliers less than Dr. Tinari's recommended multiplier of 2.

Both the individual attorney-experts upon whom plaintiffs rely and Dr. Tinari recognize that the contingency factor is required to compensate for at least two major factors—(i) delay and (ii) risk of loss and all that entails. Thus the various multipliers take into account both factors. It seems to me, however, that both the Supreme Court and the Third Circuit view these factors as distinct. The delay factor cannot help but vary from case to case. It would not make sense to have the same delay multiplier in a case which takes one year to bring to conclusion and in a case which takes five or more years to bring to conclusion. On the other hand, the risk factor would be less likely to vary with the time it takes to resolve a case.

For that reason, if a year or two elapse before conclusion of a case in which an attorneys' fee is to be awarded, I think a sum representing simple interest should be awarded. Absolute precision is unattainable in any phase of an attorneys' fee award. I shall select 10% as the rate of interest to be awarded for delay in payment. This represents the approximate interest rate during the period in question and the necessary computations are easy to make.

As mentioned above I have also concluded that the lodestar figure for each attorney should be ascertained by using his historical rates year by year. This has the added advantage of enabling one to compute the delay premium to be paid on account of each attorneys' services. The delay premium will be 10% of the lodestar amount for the year multiplied by the number of succeeding years, including in the present case the year when attorneys' fees are determined, i.e., 1990.

Appendix A to this opinion sets forth these computations for each attorney, paralegal and law student. For example in 1985 Mr. Cartagena's lodestar fee was $18,400.00. Ten percent of that amount is $1,840.00. There were five succeeding years before the determination of the fee and therefore the amount representing the delay premium for the attorneys' fees earned in that year is $9,200.00. The same procedure is followed to compute the amount representing the delay premium for each succeeding year, and the total of all these amounts constitutes the total delay premium to be awarded on account of Mr. Cartagena's legal services.

The same procedure is followed with respect to each other attorney, paralegal, law student and law clerk. The total of all individual delay premiums is to be added to the lodestar figure.

Having done this, the contingency multiplier can be determined. I exclude from consideration the patently absurd multipliers mentioned by certain of the attorney-experts, such as Mr. Medvin's 2½ to 10 figure. The reasonable figures advanced by other persons having experience in the field range from 1.25 to 3. These figures, of course, were designed for the most part to account for both delay and the risk of loss. Having concluded that the delay factor should be accounted for in a manner which reflects the actual delay in each case, the contingency multiplier, unlike those advanced by the attorney-experts in this case, need only address the risk of loss factor.

I conclude that the lowest multiplier noted by the attorney-experts, 1.25, would be sufficient to attract competent counsel in contingent fee cases. Therefore, the attorneys' fee to be awarded in the case will be the total lodestar amount ($400,200.00) plus the total premium for delay ($101,971.00) plus a lodestar multiplier of 1.25 ($100,050.00) for a total of $602,221.00.

## H. EXPENSES

■ Plaintiffs are entitled to an award for their reasonable expenses which, they assert, amount to a total of $38,420.01. With the exception of $17,099.54 expended by the Puerto Rican Legal Defense and Education Fund, Inc., the expenditures are not itemized. They are simply set forth in generalized categories, e.g., "supplies" or "travel expenses."

A principal objection is to the sum which attorneys located in Washington, D.C., spent for travel. I concluded when ascertaining the reasonable number of hours that defendants should not be required to pay for the hours which one of the Washington based attorneys devoted to travel and to activities in the New York City area. Similarly, her travel expenses should not be allowed.

Since the expenditures of the Lawyers Committee were not itemized, I can do no better than to assume that one-half the travel expenses were those of the extra attorney and deduct $5,46.93 from the request.

Otherwise, the total expenditures sought appear to be reasonable in view of the nature of the litigation and with the reduction in travel expenses the individual categories appear to be reasonable. These expenditures will be allowed in the amount of $32,953.08.

## I. ALLOCATION OF AMOUNT

■ There are two categories of defendants in this case—(i) the public defendants (Harvey L. Birne, the Superintendent of Election and the Hudson County Board of Elections) and (ii) the private defendants (Gerald McCann, Mark Munley and Matthew Burns). There had been additional private defendants, but summary judgment was granted as to them in their individual capacities during the course of the pretrial proceedings. These defendants were Board of Election members Christine Calabrese, Frank Caleca, Lee S. Lichtenberger and Julius D. Canter.

Plaintiffs propose apportioning the total award for fees and expenses 60% against the public defendants and 40% against the private defendants.

The Superintendent of Elections urges that no fees should be allocated to him for the period after October 18, 1985 when the consent order was entered in which the Superintendent agreed to follow certain policies in the November, 1985 Jersey City mayoralty election. The Superintendent asserts that he should only be responsible for 25% of the award attributable to the period prior to October 18, 1985—namely $10,936.88 plus expenses.

The other public defendants note that after the February 22, 1988 summary judgment decision in favor of the public defendants in their individual capacities the focus of the case was upon the private defendants and that they should bear the greater portion of the award. The Board of Elections urges that no more than 20% of the total award be assessed against the Board of Elections and Superintendent.

Plaintiffs have a considerable interest in the way the award is allocated. The public defendants will pay any amount assessed against them from public funds, and plaintiffs' attorneys are thus assured of payment. Recovery of the portion of the award allocated to the individual defendants, on the other hand, will be collectible only if my ruling that the insurance carrier is liable for the claims against the individual defendants is affirmed on appeal. Under the settlement agreements payment of attorneys' fees by the individual defendants is contingent upon their being covered by insurance.

Of course, the two classes of defendants also have an interest in the manner in which the award is allocated. Each class

understandably would like to have the other bear the greater burden.

I am very familiar with the case and the course it has taken during the period since its commencement. Two factors have primary significance in this case for award allocation purposes: (i) the degree of responsibility the members of each defendant class had for the transgressions which were the subject of the lawsuit and which were remedied by the final judgment in this case and (ii) the time which plaintiffs' attorneys devoted to matters primarily involving the two defendant classes. Applying these criteria it is abundantly clear to me that the individual defendants were primarily to blame for the appalling events which gave rise to this lawsuit and that plaintiffs' attorneys spent far more of their time establishing liability and securing a remedy against the individual defendants as compared to the public defendants.

These factors cannot be quantified with precision. The legal services performed with respect to the two classes of defendants overlapped and were intermingled; so hours devoted to one class cannot be separated neatly from hours devoted to the other. A general overview of the progress of the case, however, permits a reasonable allocation.

First as to the blameworthiness. It was the individual defendants who precipitated this lawsuit by the extraordinary steps they took both before and during the 1985 mayoralty election to disenfranchise black and Hispanic voters. The details of their campaign tactics are described in earlier opinions.

On the other hand, the inadequacies of the Board of Election procedures by themselves might never have precipitated a lawsuit and could well have been dealt with through negotiation or conciliation. If a lawsuit had been required it could have been completed with relatively simple pretrial procedures and a brief trial or resolution by means of summary judgment.

The extensive pretrial discovery and motions in this action were necessitated largely by the need to establish the facts concerning the individual defendants' actions and to defend against vigorous defense motions going to the merits of plaintiffs' legal and factual contentions. Insurance coverage was a major concern of plaintiffs, because only if the individual defendants were covered by insurance would plaintiffs have had a practical means of recovering significant monetary damages. The settlement negotiations with the individual defendants were considerably more difficult and complex than those with the public defendants.

The issues involving the public defendants did not involve difficult factual questions and were capable of resolution largely by motions dealing with legal issues. It is true that the individual defendants enacted their campaign drama on a stage consisting of the electorial framework administered by the Superintendent of Elections and the County Board of Elections. Thus the policies, procedures and specific actions of these officials during the 1985 mayoralty campaign were entwined in wrongful conduct of the individual defendants. But that was mere happenstance and these policies, procedures and official actions were not a part of the wrongful scheme.

Weighing the two critical factors, I conclude that the total award (including expenses) of $635,174.00 should be allocated ⅔ to the individual defendants ($423,449.00) and ⅓ to the public defendants ($211,725.00).

I request that plaintiffs' attorneys prepare an order reflecting this opinion.

APPENDIX A

| ATTORNEY, ETC. | 1985 | | | | 1986 | | | |
| | HRS | RATE | L.S. | DELAY | HRS | RATE | L.S. | DELAY |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| CARTAGENA | 184 | $100 | $18,400 | $9200 | 401 | $120 | $48,120 | $19,248 |

|  | 1985 | | | | 1986 | | | |
|---|---|---|---|---|---|---|---|---|
| ATTORNEY, ETC. | HRS | RATE | L.S. | DELAY | HRS | RATE | L.S. | DELAY |
| ISSACHAROFF | 166 | 90 | 14,940 | 7470 | 287 | 105 | 30,135 | 12,054 |
| ANDERSON | 60 | 100 | 6,000 | 3000 | | | | |
| BAER | | | | | | | | |
| HANRAHAN | 36 | 100 | 3600 | 1800 | 23 | 110 | 2530 | 1012 |
| GILL | | | | | | | | |
| FISHER | 62 | 35 | 2170 | 1085 | 65 | 35 | 2275 | 910 |
| EPSTEIN | | | | | | | | |
| CABALLERY | | | | | | | | |
| DANIELS | | | | | | | | |
| TERC | | | | | | | | |
| BERNHOLZ | | | | | | | | |
| SCHANZER | | | | | | | | |
| WILKINSON | | | | | | | | |
| KRISLOV | | | | | | | | |
| BAUER | | | | | 115 | 40 | 4600 | 1840 |
| LOPEZ | | | | | 25 | 40 | 1000 | 400 |
| MARRERO | | | | | 88 | 40 | 3520 | 1408 |
| VARGAS | | | | | | | | |
| HO | | | | | | | | |

|  | 1987 | | | | 1988 | | | |
|---|---|---|---|---|---|---|---|---|
| ATTORNEY, ETC. | HRS | RATE | L.S. | DELAY | HRS. | RATE | L.S. | DELAY |
| CARTAGENA | 306 | $130 | $39,780 | $11,934 | 196 | $140 | $27,440 | $5,488 |
| ISSACHAROFF | 171 | 120 | 20,520 | 6,156 | 280 | 135 | 37,800 | 7,560 |
| ANDERSON | | | | | | | | |
| BAER | | | | | 28 | 100 | 2800 | 560 |
| HANRAHAN | | | | | | | | |
| GILL | 17 | 35 | 595 | 178 | | | | |
| FISHER | | | | | | | | |
| EPSTEIN | | | | | 171 | 40 | 6840 | 1368 |
| CABALLERY | | | | | 20 | 40 | 800 | 160 |
| DANIELS | | | | | | | | |
| TERC | | | | | 31 | 40 | 1240 | 248 |
| BERNHOLZ | | | | | 107 | 50 | 5350 | 1070 |
| SCHANZER | 34 | 40 | 1360 | 408 | | | | |
| WILKINSON | 10 | 40 | 400 | 120 | | | | |
| KRISLOV | | | | | | | | |
| BAUER | | | | | | | | |
| LOPEZ | | | | | | | | |
| MARRERO | | | | | | | | |
| VARGAS | | | | | | | | |
| HO | | | | | | | | |

| ATTORNEY, ETC. | 1989 | | | | 1990 | | | |
|---|---|---|---|---|---|---|---|---|
| | HRS | RATE | L.S. | DELAY | HRS | RATE | L.S. | DELAY |
| CARTAGENA | 110 | $150 | $16,500 | $1,650 | 96 | $160 | $15,360 | |
| ISSACHAROFF | 214 | 150 | 32,100 | 3210 | 99 | 160 | 15,840 | |
| ANDERSON | | | | | | | | |
| BAER | 180 | 125 | 22,500 | 2250 | 69 | 125 | 8625 | |
| HANRAHAN | | | | | | | | |
| GILL | | | | | | | | |
| FISHER | | | | | | | | |
| EPSTEIN | | | | | | | | |
| CABALLERY | 41 | 40 | 1640 | 164 | 33 | 40 | 1320 | |
| DANIELS | 5 | 40 | 200 | 20 | | | | |
| TERC | | | | | | | | |
| BERNHOLZ | | | | | | | | |
| SCHANZER | | | | | | | | |
| WILKINSON | | | | | | | | |
| KRISLOV | | | | | | | | |
| BAUER | | | | | | | | |
| LOPEZ | | | | | | | | |
| MARRERO | | | | | | | | |
| VARGAS | | | | | 70 | 50 | 3500 | |
| HO | | | | | 10 | 40 | 400 | |

[TOTALS FOR YEARS 1985–1990]

| ATTORNEY, ETC. | TOTAL LODESTAR | TOTAL AWARD FOR DELAY |
|---|---|---|
| CARTAGENA | $165,600 | $ 47,520 |
| ISSACHAROFF | 151,335 | 36,450 |
| ANDERSON | 6,000 | 3,000 |
| BAER | 33,925 | 2810 |
| HANRAHAN | 6130 | 2812 |
| GILL | 595 | 178 |
| FISHER | 4445 | 1995 |
| EPSTEIN | 6840 | 1368 |
| CABALLERY | 3760 | 324 |
| DANIELS | 200 | 20 |
| TERC | 1240 | 248 |
| BERNHOLZ | 5350 | 1070 |
| SCHANZER | 1360 | 408 |
| WILKINSON | 400 | 120 |
| KRISLOV | 00 | 00 |

[TOTALS FOR YEARS 1985–1990]

| ATTORNEY, ETC. | TOTAL LODESTAR | TOTAL AWARD FOR DELAY |
|---|---|---|
| BAUER | 4600 | 1840 |
| LOPEZ | 1000 | 400 |
| MARRERO | 3520 | 1408 |
| VARGAS | 3500 | |
| HO | 400 | |
| | $400,200 | $101,971 |