Mabel A. KING, Appellant,

v.

James F. PALMER, Director, D.C. Department of Corrections, et al.

Mabel A. KING

v.

James F. PALMER, Director, D.C. Department of Corrections, et al., Appellants.

Nos. 89–7027, 89–7028.

United States Court of Appeals, District of Columbia Circuit.

Argued En Banc Feb. 27, 1991.

Decided Dec. 13, 1991.

As Amended Dec. 13, 1991.

---

Roger E. Warin, with whom Bryan T. Veis and Jerald S. Howe, Jr., Washington, D.C., were on the brief, for appellant in 89–7027 and appellee in 89–7028. Robert M. Adler and Joel P. Bennett, Washington, D.C., also entered appearances for appellants.

Donna M. Murasky, Asst. Corp. Counsel, with whom Herbert O. Reid, Sr., Corp. Counsel, John Payton, Acting Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellees in 89–7027 and appellants in 89–7028. Susan S. McDonald, Asst. Corp. Counsel, Washington, D.C., also entered an appearance for appellees in 89–7027 and appellants in 89–7028.

Michael J. Ryan, Asst. U.S. Atty., with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., John Oliver Birch and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for amicus curiae the U.S. of America in 89–7027 and 89–7028 urging reversal.

John J. Curtin, Jr., Boston, Mass., Rex E. Lee, Carter G. Phillips, and Joseph R. Guerra, Washington, D.C., were on the brief for amicus curiae The American Bar Ass'n in 89–7027 and 89–7028 urging that the panel's decision be reinstated without modification.

Daniel B. Edelman, Washington, D.C., Barry Goldstein, and Mari Mayeda, Oakland, Cal., were on the brief for amici curiae Joel P. Bennett, et al. in 89–7027 and 89–7028 urging that the panel's decision be reinstated without modification.

Blair G. Brown, Brenda V. Smith, and Richard S. Seligman, Washington, D.C., were on the brief for amicus curiae the District of Columbia Bar in 89–7027 and 89–7028 urging that the panel's decision be reinstated.

Charles Stephen Ralston, New York City, for NAACP Legal Defense Fund and Educational Fund; E. Richard Larson, New York City, for Mexican American Legal Defense and Educational Fund, Joseph M. Sellers, Washington, D.C., for Washington Lawyers' Committee for Civil Rights under Law, Gregory O'Duden, Elaine Kaplan, and Timothy Hannapel, Washington, D.C., for National Treasury Employees Union, and Paul M. Smith, Washington, D.C., for Washington Council of Lawyers, were on the joint brief for amici curiae in 89–7027

and 89–7028 urging that the panel's opinion be reinstated.

Daniel J. Popeo, New York City, entered an appearance for amicus curiae The Washington Legal Foundation and the Allied Educational Foundation in 89–7027 and 89–7028 urging reversal.

Before MIKVA, Chief Judge, WALD, EDWARDS, RUTH BADER GINSBURG, SILBERMAN, BUCKLEY, WILLIAMS, D.H. GINSBURG, SENTELLE, THOMAS,* HENDERSON, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by SILBERMAN, Circuit Judge, in which BUCKLEY, STEPHEN F. WILLIAMS, D.H. GINSBURG, SENTELLE, KAREN LeCRAFT HENDERSON, and RANDOLPH, Circuit Judges, concur.

Dissenting opinion filed by HARRY T. EDWARDS, Circuit Judge, with whom MIKVA, Chief Judge, WALD and RUTH BADER GINSBURG, Circuit Judges, join.

SILBERMAN, Circuit Judge, in which BUCKLEY, STEPHEN F. WILLIAMS, D.H. GINSBURG, SENTELLE, KAREN LeCRAFT HENDERSON, and RANDOLPH, Circuit Judges, concur:

This case concerns the circumstances in which a court making an award of reasonable attorney's fees under federal fee-shifting statutes may augment the lodestar with a contingency enhancement designed to compensate the prevailing party's attorney for the risk of losing the case. The panel opinion in this case, *King v. Palmer*, 906 F.2d 762 (D.C.Cir.1990), reviewed a district court award of attorney's fees and costs made to the plaintiff, Mabel King, pursuant to the fee-shifting provisions of Title VII. *See* 42 U.S.C. §§ 2000e–5(k), 2000e–16(d).[1] The panel rejected the Dis-

trict of Columbia's contention that no enhancement for the risk of nonpayment was proper but set aside the district court's award of an enhancement of 50% of attorney's fees subject to contingency, holding instead that Ms. King was entitled to a full 100% enhancement of those fees, relying on this court's decision in *McKenzie v. Kennickell*, 875 F.2d 330 (D.C.Cir.1989). On September 12, 1990, we granted the District of Columbia's petition suggesting rehearing *en banc* to reconsider the holding on contingency enhancements in *McKenzie*. Having reviewed the issue *en banc*, we overrule *McKenzie* and reverse the award of a contingency enhancement to Ms. King.

I.

Mabel King brought a gender discrimination claim against her employer, the District of Columbia, and ultimately received an award of back pay and retroactive promotion. *See King v. Palmer*, 778 F.2d 878, 882 n. 7 (D.C.Cir.1985), *on remand*, 641 F.Supp. 186, 187–89 (D.D.C.1986). The history of the substantive litigation underlying the dispute over attorney's fees is summarized in the panel opinion. *See King*, 906 F.2d at 764.

Ms. King experienced no difficulty in securing an attorney. She was represented throughout the litigation by the first attorney she contacted, Robert Adler, who took the case on a partial contingency basis. Ms. King contacted Mr. Adler as a result of his successful representation of a colleague of hers in another Title VII case, for which he had received a 10% contingency enhancement. Ms. King and Mr. Adler agreed that she would be responsible for litigation costs and expenses, as well as for fees of up to $5000, and that she would receive any award of damages, while Mr. Adler would receive any statutory attor-

---

* Shortly after oral argument, Judge (now Justice) Thomas recused himself and has not participated in this decision.

1. 42 U.S.C. § 2000e–5(k) provides in pertinent part:

   In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs....

Section 2000e–16(d) extends the provisions of § 2000e–5(k) to actions by employees of the District of Columbia. Congress has made clear that it intends the courts to resolve the policy questions inherent in determining what is "reasonable." *See* H.R.Rep. No. 1558, 94th Cong., 2d Sess. 8 (1976).

ney's fees that might be awarded, should Ms. King prevail. *See id.*

Mr. Adler averred that he took the case expecting that a contingency enhancement would be available. In his applications for attorney's fees following Ms. King's success on the merits, Mr. Adler twice requested a 35% fee bonus to compensate him for the risk of nonpayment he had borne during the litigation, but the district court held this request in abeyance pending the Supreme Court's decision concerning the availability of contingency enhancements in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) (*Delaware Valley II*). In the interim, the district court awarded a lodestar fee totaling $232,707.62, which comprised the reasonable number of hours Mr. Adler spent on the case multiplied by a reasonable hourly rate, and noted that a "15 [percent] bonus for the risk of not prevailing would ... be appropriate in the event that such an award is authorized by the Supreme Court." *King v. Palmer,* Civ. No. 83–1980, Rev.Mem. at 13, 1987 WL 12794 (D.D.C. June 10, 1987) (*Mem.Op.I*).

After the Court issued its fragmented decision in *Delaware Valley II,* Mr. Adler reapplied for a contingency enhancement, increasing his request to 100%. Reading Justice O'Connor's concurrence in *Delaware Valley II* as controlling the availability and degree of contingency enhancement, the district court held that the plaintiff must establish how the market compensates for contingent cases on a class-wide basis and then show that without such enhancement she would have had substantial difficulty attracting competent counsel to her case. *See King v. Palmer,* Civ. No. 83–1980–LFO, Mem. at 2, 1988 WL 104970 (D.D.C. Sept. 20, 1988) (*Mem.Op.II*). In the district court's view, Ms. King met these requirements by introducing affidavits from a number of local attorneys experienced in Title VII work asserting that they would not accept fee-shifting cases where fees were available only if the case was won, absent the prospect of contingency enhancements. *See id.* at 3. Since Ms. King had agreed to pay all costs and ex-

penses and the first $5000 of fees, however, the district court found that Mr. Adler's representation of her was only partially contingent and awarded a 50% enhancement instead of the 100% requested, on the authority of an earlier district court opinion in *Palmer v. Shultz,* 679 F.Supp. 68 (D.D.C.1988), *appeal dismissed,* No. 88–5108 (D.C.Cir.1988). *See Mem.Op.II* at 3–4. Both parties appealed.

The panel, following our previous opinion in *McKenzie v. Kennickell,* 875 F.2d 330 (D.C.Cir.1989), affirmed the district court's award of a contingency enhancement but increased it from 50% of the lodestar to 100%. *McKenzie* established a regime in which contingency enhancements would be routinely available in statutory fee-shifting cases. In reaching this result, the *McKenzie* panel treated Justice O'Connor's concurring opinion in *Delaware Valley II* as controlling and explicitly applied her admonition that "no enhancement for risk is appropriate unless the applicant can establish that without an adjustment for risk the prevailing party 'would have faced substantial difficulties in finding counsel in the local or other relevant market.'" *Delaware Valley II,* 483 U.S. at 733, 107 S.Ct. at 3091 (O'Connor, J., concurring in part and concurring in the judgment) (quoting plurality opinion at 731, 107 S.Ct. at 3089). The *McKenzie* majority described the inquiry to be conducted under this test as "counterfactual," meaning that plaintiffs "need not show that [they] *actually* experienced difficulty in obtaining representation," but merely that, "absent a contingency enhancement, plaintiffs *would have* encountered substantial difficulties in finding counsel ... [at the time] they commenced their lawsuit." *McKenzie,* 875 F.2d at 337 (first emphasis added, second in original). Thus, the majority concluded that a prevailing plaintiff under the typical fee shifting-statute could gain a contingency enhancement by producing affidavits from lawyers in the District of Columbia stating that those lawyers would not *normally* take a case on contingency unless they were paid more than their normal hourly fees if they won. Indeed, according to the majority, it

was entirely irrelevant whether counsel in the case had been "attracted by the possibility of a contingency enhancement"; the panel dismissed as beside the point the fact that one of the lawyers who took the case, the head of the *pro bono* section of a major Washington law firm, candidly stated that his firm would have taken the case even without the prospect of a contingency enhancement. *Id.* at 338. The majority reasoned that were it to deny a contingency enhancement on an "actual difficulty" basis, it would simply encourage a "charade" in which "public interest lawyers would accept a case only after announcing loudly that they were doing so on the assumption of a contingency enhancement." *Id.* at 337–38. In short, under the *McKenzie* holding, even a plaintiff who easily found counsel and whose counsel presumably expected no contingency bonus could satisfy the "substantial difficulties" test.

Judge Buckley, dissenting on this issue, thought the *McKenzie* majority misread *Delaware Valley II.* He pointed out that "Justice O'Connor joined the plurality in requiring proof that *the prevailing party* 'would have faced substantial difficulties' in obtaining competent counsel ... absent an upward fee adjustment for contingency risks." *Id.* at 340–41 (Buckley, J., concurring in part and dissenting in part) (quoting *Delaware Valley II,* 483 U.S. at 733, 107 S.Ct. at 3090) (emphasis in original). That meant, according to Judge Buckley, that we were required to pursue an "individualized approach" in which evidence of *actual* difficulties would be extremely important. *Id.* at 341.

> Because the record establishes that McKenzie and his fellow plaintiffs had *in fact* located qualified lawyers willing to represent them in Washington, D.C. in the early 1970's, I conclude that under *Delaware Valley II these fee applicants have failed to prove that the prevailing party "would have faced substantial difficulties"* in securing competent attorneys absent the incentive of an enhanced fee.

*Id.* (emphasis added).

In accordance with *McKenzie,* the panel in this case thought the failure of the district court to make a specific finding that Ms. King would have faced substantial difficulties in obtaining counsel without a risk enhancement was of no real significance. *See King,* 906 F.2d at 768. The district court had instead relied on Ms. King's attorney affidavits and on a case in which a different district judge had made a blanket finding "that attorneys in the District would not accept contingent cases without some risk enhancement." *Id.* (citing *Mem.Op.II* at 2, 4 (citing *Palmer v. Shultz,* 679 F.Supp. 68 (D.D.C.1988), *appeal dismissed,* No. 88–5108 (D.C.Cir.1988))). The panel held that the cross-citation to the other district judge's finding in conjunction with the affidavits filed in the case was sufficient to satisfy *McKenzie's* reading of Justice O'Connor's opinion.

We decided to rehear the case *en banc* in order to reconsider the interpretation of *Delaware Valley II* that the panel in *McKenzie* adopted. It is our view that the approach followed by the majority in *McKenzie* is, as Judge Buckley argued, a misreading of Justice O'Connor's concurring opinion. Moreover, we do not think that Justice O'Connor's concurring opinion in *Delaware Valley II* controls the issue of the circumstances under which contingency enhancements are permitted. We conclude that the fragmented decision in *Delaware Valley II* provides no test for determining the availability, much less the calculation, of contingency enhancements under fee-shifting statutes and that we are therefore obliged to continue the search for the most sensible rule to govern contingency enhancements. The rule we adopt is that of the *Delaware Valley II* plurality: a reasonable lodestar fee awarded under federal fee-shifting statutes may not be enhanced to compensate a prevailing party for his initial risk of loss.

## II.

### A.

*Delaware Valley II* has given rise to a spate of circuit court opinions that attempt—with varying degrees of confidence—to interpret the Supreme Court's

position. *See, e.g., Rode v. Dellarciprete,* 892 F.2d 1177, 1184–85 (3d Cir.1990); *Student Pub. Interest Research Group v. AT & T Bell Laboratories,* 842 F.2d 1436, 1451 (3d Cir.1988); *Blum v. Witco Chem. Corp.,* 829 F.2d 367, 379–82 (3d Cir.1987); *Craig v. Secretary, Dep't of Health and Human Servs.,* 864 F.2d 324, 327–28 (4th Cir.1989); *Spell v. McDaniel,* 824 F.2d 1380, 1403–05 (4th Cir.1987), *cert. denied,* 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988); *Leroy v. City of Houston,* 831 F.2d 576, 583–84 (5th Cir.1987), *cert. denied,* 486 U.S. 1008, 108 S.Ct. 1735, 100 L.Ed.2d 199 (1988); *Skelton v. General Motors Corp.,* 860 F.2d 250, 254 (7th Cir.1988); *Hendrickson v. Branstad,* 934 F.2d 158, 162–63 (8th Cir. 1991); *D'Emanuele v. Montgomery Ward & Co.,* 904 F.2d 1379, 1384 (9th Cir.1990); *Fadhl v. City of San Francisco,* 859 F.2d 649, 650–51 (9th Cir.1988) (per curiam); *Smith v. Freeman,* 921 F.2d 1120, 1122–23 (10th Cir.1990); *Wulf v. City of Wichita,* 883 F.2d 842, 876 (10th Cir.1989); *Norman v. Housing Auth.,* 836 F.2d 1292, 1302 (11th Cir.1988). We, like our sister courts of appeals, have struggled to take from the case a rule of law that defines the circumstances in which contingency enhancements may be awarded to the lawyers who represent prevailing plaintiffs under the myriad of federal fee-shifting statutes. *See McKenzie v. Kennickell,* 875 F.2d 330, 332–38 (D.C.Cir.1989); *id.* at 340–43 (Buckley, J., dissenting); *Weisberg v. U.S. Dep't of Justice,* 848 F.2d 1265, 1272–73 (D.C.Cir. 1988); *Thompson v. Kennickell,* 836 F.2d 616, 621 (D.C.Cir.1988); *Save Our Cumberland Mountains, Inc. v. Hodel,* 826 F.2d 43, 53 n. 6 (D.C.Cir.1987), *vacated on other grounds,* 857 F.2d 1516 (D.C.Cir. 1988) (en banc).

The Supreme Court's decisions on attorney's fees prior to *Delaware Valley II* had established the lodestar—a measure of fees defined by the number of hours reasonably expended on a case multiplied by a reasonable market rate per hour—as the presumptively reasonable award, steadily subsuming most other factors into that single calculation. *See Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983); *Blum v. Stenson,* 465 U.S. 886, 897–902, 104 S.Ct. 1541, 1548–1551, 79 L.Ed.2d 891 (1984); *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 564–66, 106 S.Ct. 3088, 3097–99, 92 L.Ed.2d 439 (1986) (*Delaware Valley I* ). Twice, however, the Supreme Court had specifically reserved the question whether the lodestar could ever be enhanced to reflect the risk of nonpayment assumed by an attorney accepting a case under a statute that authorized fees only to the prevailing party. *See Blum,* 465 U.S. at 901 n. 17, 104 S.Ct. at 1550 n. 17; *Delaware Valley I,* 478 U.S. at 568, 106 S.Ct. at 3199–3200. *Delaware Valley II* attempted to resolve this issue.[2]

The judgment in *Delaware Valley II* reversed an award of a 100% contingency enhancement.[3] Justice White, writing for a plurality of four Justices, concluded in Part IV of his opinion that contingency enhancements under fee-shifting statutes are simply "impermissible." *Delaware Valley II,* 483 U.S. at 727, 107 S.Ct. at 3087–88 (plurality opinion). Nevertheless, the plurality went on in Part V to suggest that if contingency bonuses were to be made available at all, they "should be re-

---

**2.** We do not understand how, as the dissent suggests, the discrete question presented in this case—whether a contingency enhancement is properly included within an award of attorney's fees—can possibly be thought a matter for the discretion of the trial judge. If the overall reasonableness of a statutory attorney's fee award were always a matter for the trial judge's discretion, unguided by a legal structure, the Supreme Court certainly has wasted a good deal of time and effort attempting to develop uniform rules. *See Blanchard v. Bergeron,* 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989); *Delaware Valley II,* 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987); *Delaware Valley I,* 478 U.S. 546, 106

S.Ct. 3088, 92 L.Ed.2d 439 (1986); *Blum,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Hensley,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

**3.** *Delaware Valley II* interpreted the fee-shifting provision of the Clean Air Act, 42 U.S.C. § 7604(d). However, the Court has said that its standards for determining "reasonable" fees apply to all federal statutes awarding "reasonable" attorney's fees to a "prevailing party," including Title VII. *See Hensley,* 461 U.S. at 433 n. 7, 103 S.Ct. at 1939 n. 7.

served for exceptional cases." *Id.* at 728, 107 S.Ct. at 3088. Four Justices in dissent would have allowed a contingency enhancement in any case in which "an attorney and client have been unable to mitigate the risk of nonpayment," *id.* at 749, 107 S.Ct. at 3099 (Blackmun, J., dissenting), as well as "additional enhancement" in those cases posing great " 'legal' risks." *Id.* at 751, 107 S.Ct. at 3100. Under the dissent's test, contingency enhancements would be "appropriate in most circumstances." *Id.* at 741, 107 S.Ct. at 3095.

Justice O'Connor concurred in part and concurred in the judgment reversing the award. She agreed with the dissenters that "Congress did not intend to foreclose consideration of contingency in setting a reasonable fee." *Id.* at 731, 107 S.Ct. at 3089 (O'Connor, J., concurring in part and concurring in the judgment). But she joined in the plurality's judgment that the record before the Court did not justify a contingency enhancement. *See id.* at 734, 107 S.Ct. at 3091. She also agreed with the plurality that no enhancement could be awarded for the "legal" risks peculiar to the specific case. *See id.* at 731, 734, 107 S.Ct. at 3089–90, 3091. Finally, Justice O'Connor agreed with the statement in Part V of the plurality opinion "that no enhancement for risk is appropriate unless the applicant can establish that without an adjustment for risk the prevailing party 'would have faced substantial difficulties in finding counsel in the local or other relevant market.' " *Id.* at 733, 107 S.Ct. at 3091 (quoting plurality opinion at 731, 107 S.Ct. at 3089).

### B.

■ In our prior opinions interpreting *Delaware Valley II,* we, like other circuit courts, have assumed that Justice O'Connor's concurrence controls. *See McKenzie v. Kennickell,* 875 F.2d 330, 332–38 (D.C.Cir.1989); *id.* at 340–43 (Buckley, J., dissenting); *Weisberg v. U.S. Dep't of Justice,* 848 F.2d 1265, 1272–73 (D.C.Cir.1988); *Thompson v. Kennickell,* 836 F.2d 616, 621 (D.C.Cir.1988); *Save Our Cumberland Mountains, Inc. v. Hodel,* 826 F.2d 43, 53

n. 6 (D.C.Cir.1987), *vacated on other grounds,* 857 F.2d 1516 (D.C.Cir.1988) (en banc). But we have not focused on the fact that there are two analytically distinct questions involved in awarding a contingency enhancement. First, a court must decide whether an enhancement is available at all. Then, assuming an enhancement is warranted, the court must calculate its amount. Virtually all of Justice O'Connor's relatively brief opinion deals with the second question. But the question of *availability* of enhancements logically precedes the question of their *calculation.*

To ascertain when contingency enhancements should be made available under *Delaware Valley II,* we have looked for some common ground between Justice O'Connor's concurrence and the plurality opinion. We have had little difficulty placing a *label* on that common ground, since Justice O'Connor expressly joined the plurality's statement in Part V that enhancements should be available only when a plaintiff would have faced "substantial difficulties" in attracting counsel to his case without the prospect of an enhancement. However, we and the other courts of appeals have had considerable trouble determining the *content* of that "substantial difficulties" label—that is, determining just how "substantial" the "difficulties" in attracting counsel have to be, and how they must be proven.

In this search for content, several of our sister circuits have read Justice O'Connor's concurrence as implicitly agreeing with the plurality's statement, *Delaware Valley II,* 483 U.S. at 727, 107 S.Ct. at 3087–88 (plurality opinion), that contingency bonuses should be available only in "exceptional cases." *See, e.g., Student Pub. Interest Research Group v. AT & T Bell Laboratories,* 842 F.2d 1436, 1451–52 (3d Cir.1988) ("[C]ontingency multipliers should be granted only rarely."); *Norman v. Housing Auth.,* 836 F.2d 1292, 1302 (11th Cir. 1988) ("[I]n the rare case enhancement may be appropriate. . . ."). Appellant presses this position upon us here. And in *Thompson v. Kennickell,* we made a similar suggestion, describing *Delaware Valley II* in Gilbert and Sullivan terms: "What, never?

No, never!" for the plurality, and "What, *never?* Hardly ever!" for Justice O'Connor. *Thompson,* 836 F.2d at 621 (emphasis in original).

To be sure, Justice O'Connor does not say at any point that she disagrees with the plurality's "exceptional cases" position. And she does endorse the plurality's view that the lodestar is a presumptively adequate fee. *See Delaware Valley II,* 483 U.S. at 733–34, 107 S.Ct. at 3090–91 (O'Connor, J., concurring in part and concurring in the judgment). Moreover, Justice O'Connor joined the reversal of the award of a contingency enhancement *without a remand,* notwithstanding the dissenters' powerful argument that the applicant should be given an opportunity to develop the record to meet the Supreme Court's standard. *See id.* at 754–55, 107 S.Ct. at 3101–02 (Blackmun, J., dissenting); *cf. Thompson,* 836 F.2d at 621 (remanding for application of *Delaware Valley II* ). This at least suggests that Justice O'Connor believed that contingency enhancements should be available only in those presumably rare situations in which the need was readily apparent. Still, she did not join Part V of the plurality opinion, so we cannot be sure that she accepted the "exceptional cases" limitation.

There is only one point concerning the availability of contingency enhancements that a fair reading of Justice O'Connor's concurrence clearly supports. This point is that evidence of *actual* difficulties is highly probative of the "substantial difficulties" *Delaware Valley II* describes. In adopting the plurality's "substantial difficulties" test, Justice O'Connor quotes from Part V of the plurality opinion. The passage she quotes concludes with a footnote that we presume Justice O'Connor adopted along with the textual language she cited. The footnote states: " 'an attorney's fee award should be only as large as necessary to attract competent counsel,' and *'one relevant factor bearing on high-risk is whether other counsel had declined to take the case because there was little or no prospect of earning a fee.' " Id.* at 731 n. 12, 107 S.Ct. at 3089 n. 12 (plurality opinion) (quoting *Lewis v. Coughlin,* 801 F.2d 570, 576 (2d Cir.1986)) (emphasis added). And, as Judge Buckley noted in *McKenzie,* "Justice O'Connor joined the plurality in requiring proof that *the prevailing party* 'would have faced substantial difficulties' obtaining competent counsel 'in the relevant market,' absent an upward fee adjustment for contingency risks." *McKenzie,* 875 F.2d at 340–41 (Buckley, J., concurring in part and dissenting in part) (quoting *Delaware Valley II,* 483 U.S. at 733, 107 S.Ct. at 3090 (O'Connor, J., concurring in part and concurring in the judgment)) (emphasis in original). We thus believe that five Justices envisioned a particularized factual inquiry into the plaintiff's *actual* difficulties in retaining counsel—the kind of inquiry that Judge Buckley thought necessary but the majority in *McKenzie* eschewed. *But see Morris v. American Nat'l Can Corp.,* 941 F.2d 710, 715 (8th Cir.1991) (stating no actual difficulties need be shown) (citing *McKenzie,* 875 F.2d at 337).

This is, we recognize, a hard standard to meet. Indeed, if evidence that other counsel actually refused the case is only "one relevant factor" in determining whether the plaintiff would have had "substantial difficulties" in obtaining counsel without a risk enhancement—a factor insufficient by itself to justify awarding an enhancement—the plaintiff's burden in producing sufficient evidence to meet the test must be quite daunting. And it also follows that a plaintiff's failure to put on *any* evidence of actual difficulties in attracting counsel without extra compensation would severely undermine a claim for a contingency enhancement.

The district court here made no finding that Ms. King would have faced substantial difficulties in attracting counsel without a contingency bonus. Nor was there any evidence that Ms. King faced actual difficulties in securing representation. As it happened, Robert Adler was the first attorney the plaintiff contacted, and, although he later stated that he would not have accepted representation without the "definite possibility" of a contingency enhancement, his fee award in a previous case had

been enhanced by only 10%. Given the uncertain state of the law at the time he took this case (which is not to say that it is particularly clear today) and his previous experience, the "definite possibility" to which he referred does not seem very weighty. In his engagement letter to Ms. King, Mr. Adler referred only to charging his "hourly rates" and stated that he would "seek an award of attorneys' fees from the defendants *with respect to those amounts,* should we be the prevailing party." Joint Appendix (J.A.) at 73a (emphasis added). It does not seem to us that Mr. Adler's testimony goes very far to meet the plaintiff's burden under the "substantial difficulties" test.

Before the district court and again before us, Ms. King has also sought to rely on the affidavits of attorneys who were not approached by Ms. King and were never involved in the case.[4] These affidavits—some from Title VII practitioners, some from practitioners from other areas—contend that lawyers would not take cases on a non-fee-paying basis without contingency enhancements. We do not think that we can accept such evidence as meeting the substantial difficulties test. Without in any way denigrating the *bona fides* of these lawyers, we cannot blink the fact that they are obviously self-interested. We think it is indisputable that if such evidence were treated as determinative, or even weighty, the substantial difficulties test would be met so easily as to become a mere formality. The Supreme Court has itself recently disparaged such anecdotal evidence from attorneys unconnected with the case in the context of attorney's fees disputes. *See United States Dep't of Labor v. Triplett,* 494 U.S. 715, 110 S.Ct. 1428, 1433–34, 108 L.Ed.2d 701 (1990) (holding such evidence to be "blatantly insufficient"

to raise a constitutional doubt about federal limits on attorney's fees, "even if entirely unrebutted").

Nor do we believe the few affidavits presented that expressed a view as to whether the affiant lawyer would or would not have taken Ms. King's case add much to her claim for an enhancement. Insofar as they seek to hypothesize whether the affiants would have taken her case, they focus (inevitably it seems to us) on the strength or weakness of her claim. *See supra* note 3. But in *Delaware Valley II,* it will be recalled, both the plurality and Justice O'Connor regarded that factor as inappropriate. *See Delaware Valley II,* 483 U.S. at 726, 107 S.Ct. at 3087 (plurality opinion); *id.* at 734, 107 S.Ct. at 3091 (O'Connor, J., concurring in part and concurring in the judgment).

In sum, even if we were to apply Justice O'Connor's concurrence as the holding of *Delaware Valley II,* we think Ms. King's evidence does not paint a picture of a situation where a contingency enhancement is necessary to "mak[e] it possible for poor clients with good claims to secure competent help." *Id.* at 730–31, 107 S.Ct. at 3089.

### C.

Although we have determined that Ms. King failed to carry her burden under Justice O'Connor's opinion in *Delaware Valley II,* candor obliges us to concede that we are unable to set forth a conceptual framework that would govern further litigation on the subject of contingency enhancements. We have certainly suggested, in accordance with our understanding of the substantial difficulties test, that actual evidence that attorneys did refuse a case is of greater probative value

---

**4.** Of these numerous affidavits, only five addressed the facts of Ms. King's particular case or expressed any opinion at all about whether Ms. King herself would have faced substantial difficulties in attracting competent counsel absent the availability of a contingency enhancement. Two of these described the weakness and difficulty of her case as the principal reason the affiants would have been unwilling to assume representation. *See* J.A. at 112d (Cashdan); 173b (Fitzpatrick). Another attorney allowed

that his firm would possibly have represented Ms. King if she had an "exceptionally strong claim." J.A. at 124b (Chuzi). The fourth admitted there was at least a possibility, although "remote," of finding *pro bono* representation for Ms. King. *See* J.A. at 214 (Lapidus). Only a single affidavit stated flatly that the affiant would not take Ms. King's case because of the unavailability of contingency enhancements. *See* J.A. at 177 (Gottfried).

than the hypothetical testimony of non-involved and self-interested lawyers. But we are sorely troubled by, and indeed we have no answer to, the *McKenzie* majority's argument that focusing on actual difficulties will encourage "a charade in which clients seeking representation under fee shifting statutes would be steered to several attorneys whose pre-arranged role it would be to 'refuse' the case, knowing that such refusals were necessary to permit the eventual award of fees." *McKenzie*, 875 F.2d at 337. We think the *McKenzie* majority was also correct in suggesting that emphasizing the actual difficulties a plaintiff had in obtaining counsel will create perverse incentives by discouraging those very "reference services ... that make it easier for litigants to find legal representation." *Id.*

To add to our quandary, even if we did have evidence that several lawyers had declined Ms. King's case, we think it would be impossible to separate out from their decision not to represent her the strength or weakness of her claim as it appeared to them at the time. After all, this is surely the principal reason a lawyer will turn down a case under a fee-shifting statute. *Delaware Valley II*, however, tells us unequivocally that the risk of loss in a particular case is not a factor that courts may look at in determining whether a contingency enhancement is appropriate. "[A] court should not award any enhancement based on 'legal' risks or risks peculiar to the case." *Delaware Valley II*, 483 U.S. at 734, 107 S.Ct. at 3091 (O'Connor, J., concurring in part and concurring in the judgment); *see also id.* at 726–27, 107 S.Ct. at 3087–88 (plurality opinion).[5] If the courts cannot do so directly, how can it be appropriate to do so vicariously through the eyes of lawyers who declined the case?

The more we struggle with this problem, the more we are convinced that it is virtually impossible to determine whether a given plaintiff would have had "substantial diffi-

culties" in obtaining counsel without a contingency enhancement. The inquiry is quite artificial, because, by definition, the plaintiff stands before the court with counsel. And since counsel could not possibly know whether a risk enhancement was in the offing until a court decides the question years later, our inquiry is circular. As Judge Williams noted in his concurrence in the panel opinion in this case, whether a plaintiff *would have* faced substantial difficulties absent the possibility of a contingency enhancement is essentially unknowable when the most critical assumption necessary to make such a counterfactual judgment is itself the issue before the court. *See King*, 906 F.2d at 770 (Williams, J., concurring) ("I view causation as running in the opposite direction from that supposed by the controlling precedents; I see the judicial judgment as defining the market, not vice versa.").

As Judge Buckley correctly observed in *McKenzie*, if Justice O'Connor's opinion controls the holding of *Delaware Valley II*, we would be obliged to apply the "substantial difficulties" test, notwithstanding these analytical difficulties, "like it or not." *McKenzie*, 875 F.2d at 342 (Buckley, J., concurring in part and dissenting in part). But the difficulties we have described have prompted us to think harder about what the controlling principles of *Delaware Valley II* really are; specifically, we have reconsidered whether we have been correct in assuming that Justice O'Connor's concurring opinion governs the subject of contingency enhancements. We have regarded her concurrence as controlling largely in reliance on the Supreme Court's admonition in *Marks v. United States*, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), that when the Court issues fragmented opinions, the opinion of the Justices concurring in the judgment on the "'narrowest grounds'" should be regarded as the Court's holding. *Id.* at 193, 97 S.Ct. at 993–94 (quoting

5. The dissent, nevertheless, would calculate the amount of contingency enhancement based on the degree of risk faced by the plaintiff's lawyer in *each case*. As the plurality in *Delaware Valley II* noted, that approach would provide incentives to bring the weakest cases to court, and it

would put the district judge who had to make that determination in a difficult psychological posture. *See Delaware Valley II*, 483 U.S. at 722, 107 S.Ct. at 3085; *id.* at 725, 107 S.Ct. at 3086–87 (plurality opinion).

*Gregg v. Georgia*, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). But *Marks* is workable—one opinion can be meaningfully regarded as "narrower" than another—only when one opinion is a logical subset of other, broader opinions. In essence, the narrowest opinion must represent a common denominator of the Court's reasoning; it must embody a position implicitly approved by at least five Justices who support the judgment.

In *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), for example, the Court interpreted its earlier nine-way split in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (per curiam). In *Furman*, the five Justices who supported the judgment that Georgia's death penalty statute was unconstitutional produced five separate opinions. Two Justices concluded that the death penalty was unconstitutional in all circumstances. *See id.* at 305–06, 92 S.Ct. at 2760–61 (Brennan, J., concurring); *id.* at 370–71, 92 S.Ct. at 2793–94 (Marshall, J., concurring). Three others found specific defects in the Georgia statute but declined to decide whether capital punishment might be constitutional under other circumstances. Of these, Justices Stewart and White felt that the Georgia death penalty was unconstitutional because it was applied in an arbitrary and capricious manner, *see id.* at 309–10, 92 S.Ct. at 2762–63 (Stewart, J., concurring); *id.* at 313, 92 S.Ct. at 2764 (White, J., concurring), while Justice Douglas stated that it was unconstitutional because it was "pregnant with discrimination," falling more harshly on minorities and the poor both because its application was discretionary rather than mandatory and because wealthy defendants could afford better counsel. *See id.* at 255–57, 92 S.Ct. at 2734–36 (Douglas, J., concurring).

In *Gregg*, the Court—in another fragmented opinion—treated the opinions of Justices Stewart and White as controlling. *See Gregg*, 428 U.S. at 169 n. 15, 96 S.Ct. at 2923 n. 15 (plurality opinion). Justices Marshall and Brennan, who believed the

death penalty unconstitutional in all circumstances, surely agreed with Justices Stewart and White that it was unconstitutional when administered in an arbitrary and capricious manner. By the same token, Justice Douglas, who insisted that any discretion in the judge or jury to decide when to impose capital punishment rendered the arrangement unconstitutional, would certainly have subscribed to Justice Stewart's notion that the death penalty could not be administered constitutionally to "a capriciously selected random handful" of criminals. *Furman*, 408 U.S. at 309–10, 92 S.Ct. at 2762–63 (Stewart, J., concurring). Selecting the opinions of Justices Stewart and White as the holding of *Furman* in *Gregg* was thus unproblematic.

Similarly, in *Marks* itself, the Court adopted as the governing definition of obscenity the position of the plurality from the earlier case of *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of Massachusetts*, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966) (*Fanny Hill*). In *Fanny Hill*, three separate views supported the judgment that the book was not obscene: the view expressed in the plurality opinion, which said that a book had to be "utterly without redeeming social value" to be considered obscene, *see id.* at 419, 86 S.Ct. at 977–78 (opinion of Brennan and Fortas, JJ., and Warren, C.J.) (emphasis omitted); the view of Justice Stewart that only "hardcore" pornography could be banned as obscene, *see id.* at 421, 86 S.Ct. at 978–79 (opinion of Stewart, J.); and the view of Justices Black and Douglas, who believed that obscenity could never be banned. *See id.* at 421, 86 S.Ct. at 978–79 (opinion of Black, J.); *id.* at 433, 86 S.Ct. at 985 (opinion of Douglas, J.). Because Justices Black and Douglas had to agree, as a logical consequence of their own position, with the plurality's view that anything with redeeming social value is not obscene, the plurality of three in effect spoke for five Justices: *Marks'* "narrowest grounds" approach yielded a logical result.[6]

---

6. Justice Stewart's "hardcore" test, though it was

also a logical subset of Justice Black and Doug-

When, however, one opinion supporting the judgment does not fit entirely within a broader circle drawn by the others, *Marks* is problematic. If applied in situations where the various opinions supporting the judgment are mutually exclusive, *Marks* will turn a single opinion that lacks majority support into national law. When eight of nine Justices do not subscribe to a given approach to a legal question, it surely cannot be proper to endow that approach with controlling force, no matter how persuasive it may be.

The Court itself appears not to apply *Marks* in cases of this type. To take one example, in *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), a plurality of four Justices held that only when evidence was discovered "inadvertently" could it be seized pursuant to the plain view exception to the Fourth Amendment's warrant requirement. *See id.* at 469, 91 S.Ct. at 2040 (plurality opinion). Four other Justices believed that inadvertence was not necessary for a valid seizure of evidence in plain view. *See id.* at 492, 91 S.Ct. at 2051 (Burger, C.J., concurring in part and dissenting in part); *id.* at 506, 91 S.Ct. at 2058 (Black, J., concurring in part and dissenting in part); *id.* at 510, 91 S.Ct. at 2060 (Blackmun, J., concurring in part and dissenting in part); *id.* at 516, 91 S.Ct. at 2063 (White, J., concurring in part and dissenting in part). Justice Harlan concurred in the judgment that the search in question was unconstitutional but provided no reasoning by which one could discern his position on the inadvertence requirement. *See id.* at 490, 91 S.Ct. at 2050 (Harlan, J., concurring in the judgment). The Court subsequently stated that the inadvertence requirement was "not a binding precedent" and was merely "the considered opinion of four Members of this Court" that should be "the point of reference for further discussion of the issue." *Texas v. Brown*, 460 U.S. 730, 737, 103 S.Ct. 1535, 1540-41, 75 L.Ed.2d 502 (1983) (plurality opinion). The Court eventually disavowed the inadvertence requirement entirely. *See*

*Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 2308-10, 110 L.Ed.2d 112 (1990).

It seems to us that *Delaware Valley II* is one of the fragmented opinion cases that cannot be resolved satisfactorily by *Marks*. Unlike *Furman* or *Fanny Hill*, *Delaware Valley II* is not a case in which the concurrence posits a narrow test to which the plurality must necessarily agree as a logical consequence of its own, broader position. In other words, it is not a case in which there is an implicit majority of the Court. Rather, *Delaware Valley II* involves three distinct approaches to the issue of contingency enhancements in fee-shifting statutes, none of which enjoys the support of five Justices.

Superficially, to be sure, there is a common link between the plurality opinion and Justice O'Connor's concurrence; both Part V of the plurality opinion and Justice O'Connor seem to endorse the substantial difficulties test we sought to apply earlier in this opinion. But the plurality quite clearly indicated in Part IV that it did not believe that contingency enhancements were ever available. *See Delaware Valley II*, 483 U.S. at 727, 107 S.Ct. at 3087-88 (plurality opinion). Therefore, Part V appears to have been composed not as an alternative holding but rather as a fall-back position, an invitation, as it were, to Justice O'Connor to reach common ground. Since Justice O'Connor did not accept the plurality's invitation, explicitly declining to join Part V, the plurality's true position remains that expressed in Part IV.

Justice O'Connor does appear to accept the bare concept that contingency enhancements should not be awarded unless the plaintiff shows substantial difficulties, but it is far from clear, as we noted earlier, what content she would give to the "substantial difficulties" test the plurality articulates in Part V. Her concurrence does not contain enough independent reasoning on the question of availability to allow us to compare her position analytically to that of the plurality. In that sense, her opinion

las' opinion, would only have spoken for three Justices and could therefore not have been the

controlling rationale.

on that issue approaches Justice Harlan's in *Coolidge.*

Even if it were possible to determine from Justice O'Connor's opinion *when* to apply a contingency enhancement and to conclude that her views on that subject were somehow narrower than the plurality's, it is quite clear that one could not say in the *Marks* sense that her carefully explained view of *how* the contingency enhancement should be calculated is narrower than the plurality's answer to that question. The plurality in Part V stated that if an upward adjustment for contingency risk were applied, the amount should be based on the "real risk-of-not-prevailing" in the case—but as a general rule should be "no more than one-third of the lodestar." *Id.* at 730, 107 S.Ct. at 3089. Justice O'Connor, on the other hand, takes a different approach altogether, one that does not vary with the riskiness of the individual case but rather is based on a class determination of the amount of contingency enhancement usually paid in the relevant market, with no explicit ceiling. *See id.* at 731–34, 107 S.Ct. at 3089–91 (O'Connor, J. concurring in part and concurring in the judgment). We do not see how either approach can be thought "narrower" than the other; they are simply different.

To apply *Marks* to *Delaware Valley II,* we would have to conclude that Justice O'Connor's answers to both the "when" and the "how" questions were "narrower" than the plurality's in Part V. Without implicit agreement on both, it is simply impossible to regard the substantial difficulties test as controlling. Of course, as we have recognized, how one calculates a contingency enhancement could be thought to be a separate analytic issue from the question whether and under what circumstances a contingency enhancement is available. But as the panel opinion and other cases demonstrate, the two questions tend to run together. *See King,* 906 F.2d at 765–68; *McKenzie,* 875 F.2d at 334–37; *Student Pub. Interest Research Group v. AT & T Bell Laboratories,* 842 F.2d 1436, 1451 (3d Cir.1988). It is very difficult to consider the circumstances under which a contingency enhancement is "necessary" to attract counsel without contemplating the amount of the enhancement; each part of the inquiry has inevitable ramifications for the other. This may be the reason Justice O'Connor's opinion focuses so heavily on the "how" question. Because her answer to that question is so clearly at odds with that of the plurality, however, we are left without a controlling opinion or a governing test for awarding contingency enhancements under *Delaware Valley II.*

The Third Circuit, taking a different approach, has reasoned that Justice O'Connor's opinion can be regarded as a subset of the dissent if not the plurality. As such, Justice O'Connor's concurrence would speak for a majority of the Court. *See id.* ("Because the four dissenters would allow contingency multipliers in all cases in which Justice O'Connor would allow them, her position commands a majority of the Court."). The Third Circuit appears to apply the *Marks* methodology to reach this result, but it does not explicitly rely on *Marks. See id.* at 1451 n. 16 (citing *Marks* as a "see also" in a footnote appended to the citation of a circuit opinion). This is understandable, because *Marks* has never been so applied by the Supreme Court, and we do not think we are free to combine a dissent with a concurrence to form a *Marks* majority. As the Court said in *Marks* itself, "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by *those members who concurred in the judgments* on the narrowest grounds.'" *Marks,* 430 U.S. at 193, 97 S.Ct. at 993 (quoting *Gregg,* 428 U.S. at 169 n. 15, 96 S.Ct. at 2923 n. 15 (opinion of Stewart, Powell, and Stevens, JJ.)).

To be sure, in *Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986), the Supreme Court, in interpreting *Rose v. Mitchell,* 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), emphasized that an opinion that combines shifting majorities in various portions is no less binding than would be an opinion in which the same Justices formed the majority for all the sections. *See Vasquez,* 474 U.S. at

261–62 n. 4, 106 S.Ct. at 622 n. 4; *see also Arizona v. Fulminante,* —— U.S. ——, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (employing two distinct majorities to arrive at a judgment, both of which therefore constitute binding law). That, however, is quite a different situation than the one that the *Marks* methodology addresses, where there is no explicit majority agreement on all the analytically necessary portions of a Supreme Court opinion. Under these latter circumstances, if the application of *Marks* will not yield a majority holding, nothing will.[7]

To say that *Delaware Valley II* provides no controlling legal holding is not to say that it has no binding impact on us. Because the Court's result was to deny a contingency enhancement without even a remand, we think we could not authorize the routine awarding of contingency enhancements of whatever size. *Cf. National Mut. Ins. Co. v. Tidewater Transfer Co.,* 337 U.S. 582, 655, 69 S.Ct. 1173, 1199–1200, 93 L.Ed. 1556 (1949) (Frankfurter, J., dissenting) (noting that the result is binding even when the Court fails to agree on reasoning). We furthermore believe, as this opinion and the dissent make clear, that there simply is no practical middle ground between providing enhancements routinely and not providing them at all. Keeping in mind that a majority of the Supreme Court clearly agrees that the question of attorney's fees must not turn into major litigation in itself, *see Delaware Valley II,* 483 U.S. at 722, 107 S.Ct. at 3085, we think the appropriate course is to hold that contingency enhancements will not be available in this Circuit.[8] We note that although other circuit courts have set forth various tests for awarding contingency enhancements under *Delaware Valley II,* most of the tests appear to be difficult, if not impossible, to meet in practice. *See, e.g., Student Pub. Interest Research Group v. AT & T Bell Laboratories,* 842 F.2d 1436, 1451–52 (3d Cir.1988) ("[C]ontingency multipliers should be granted only rarely."); *Craig v. Secretary, Dep't of Health and Human Servs.,* 864 F.2d 324, 327 (4th Cir.1989) (no contingency enhancement available "in the absence of exceptional circumstances"); *Leroy v. City of Houston,* 831 F.2d 576, 583 (5th Cir.1987) (contingency enhancements should be "reserved for 'exceptional cases'" (citation omitted)); *Skelton v. General Motors Corp.,* 860 F.2d 250, 254 (7th Cir.1988) (contingency enhancements available only if plaintiffs meet "stringent requirements"); *Hendrickson v. Branstad,* 934 F.2d 158, 162 (8th Cir.1991) ("[E]nhancement is reserved for 'rare' and 'exceptional' cases...."); *Smith v. Freeman,* 921 F.2d 1120, 1123 (10th Cir.1990) (quoting plurality's view that "enhancement for the risk of nonpayment should be reserved for exceptional cases"); *Norman v. Housing Auth.,* 836 F.2d 1292, 1302 (11th Cir.1988) ("[I]n the rare case enhancement may be appropriate...."). *But cf. D'Emanuele v. Montgomery Ward & Co.,* 904 F.2d 1379, 1383 (9th Cir.1990) (implying that routine

---

**7.** In our view, even applying the Third Circuit's reasoning, we do not think Justice O'Connor's concurrence constitutes a controlling opinion in *Delaware Valley II.* For similar reasons to those we outlined in our discussion as to whether her opinion could be thought narrower than the plurality opinion, Justice O'Connor's thoughtful answer to the question of how to calculate a contingency enhancement should it be available cannot possibly be thought a subset of the dissent's approach to the same issue. She herself recognizes this. *See Delaware Valley II,* 483 U.S. at 732, 107 S.Ct. at 3090 (O'Connor, J., concurring in part and concurring in the judgment).

**8.** The dissent's reliance on the legislative history of 42 U.S.C. § 1988—particularly citations to

*Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974)—comes too late. The Supreme Court has, on several occasions, indicated that it does not regard factors listed separately in *Johnson* as appropriate enhancements to the lodestar. *See Blum v. Stenson,* 465 U.S. 886, 898–99, 104 S.Ct. 1541, 1548–49, 79 L.Ed.2d 891 (1984); *Delaware Valley I,* 478 U.S. 546, 564, 566, 106 S.Ct. 3088, 3097–98, 3098–99, 3098, 92 L.Ed.2d 439 (1986). And the dissent's citation of *Blanchard v. Bergeron,* 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989), is also misplaced. There the Supreme Court was dealing with an entirely different issue—the question whether an actual, private contingency fee arrangement limited a statutory award, not whether a contingency factor should be added to the lodestar.

contingency enhancements might be justified).

We have done our best to apply *Delaware Valley II* but have been unable to derive a governing rule from the opinion. Considering our struggle to understand and apply *Delaware Valley II* as well as the difficulties our sister circuits have experienced, we urge the Supreme Court to clarify its position.

\*     \*     \*     \*     \*     \*

For the foregoing reasons, we overrule *McKenzie v. Kennickell*, 875 F.2d 330 (D.C.Cir.1989), and those portions of our other previous opinions inconsistent with our current disposition, and reverse the contingency enhancement portion of the attorney's fees allowed to appellant.

*It is so ordered.*

HARRY T. EDWARDS, Circuit Judge, with whom MIKVA, Chief Judge, WALD and RUTH BADER GINSBURG, Circuit Judges, join, dissenting:

In deciding this appeal, we are constrained to apply a specific statutory provision, section 706(k) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(k) (1988), under which the District Court has broad authority to assess the reasonableness of a fee request. In the absence of legal error, the trial judge's determination as to reasonableness may not be disturbed unless it is an *abuse of discretion.* Given this highly deferential standard of review, there is no legitimate basis whatsoever for this court to overturn the judgment of the trial judge on the facts of this case.

Furthermore, the majority's new rule, that contingency awards are never justified, is completely without foundation. Twelve other circuits have reviewed the question at hand, and not one other circuit

has adopted a rule that completely bars contingency enhancements.

The plaintiff, Mabel King, was awarded an attorney's fee pursuant to section 706(k), which reads, in pertinent part, as follows:

In any action or proceeding under this subchapter the court, *in its discretion,* may allow the prevailing party ... *a reasonable attorney's fee* as part of the costs [of bringing the action]....

42 U.S.C. § 2000e–5(k) (1988) (emphasis added). As may be seen from the clear terms of the statute, the "district court is expressly empowered to exercise discretion in determining whether an award is to be made and if so its reasonableness." *Blum v. Stenson*, 465 U.S. 886, 902 n. 19, 104 S.Ct. 1541, 1550 n. 19, 79 L.Ed.2d 891 (1984). The Supreme Court has *emphasized* that it is entirely "appropriate" that the trial judge have broad authority in determining the amount of a fee award "in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983).[1]

In this case, the District Court awarded an attorney's fee that compensates Ms. King's counsel for the risk of having taken the case on a contingent-fee basis. In reaching its conclusion that a 50% enhancement over normal hourly rates was "reasonable" compensation in this case, the District Court properly looked to evidence of prevailing market practices to ensure that the fee award was roughly commensurable with what counsel could obtain on the open market. There is no doubt, given the language of the statute, that the District Court's judgment in this regard is to be reviewed under a highly deferential, abuse-of-discretion standard. *See Blum*, 465 U.S.

---

1. *See also Blanchard v. Bergeron*, 489 U.S. 87, 96, 109 S.Ct. 939, 945–46, 103 L.Ed.2d 67 (1989) ("It is central to the awarding of attorney's fees ... that the district court judge, in his or her good judgment, make the assessment of what is a reasonable fee under the circumstances of the case.").

Although some of these precedents focus upon the parallel fee-shifting provision set out

in the Civil Rights Attorney's Fees Awards Act of 1976, Pub.L. No. 94–559, 90 Stat. 2641, *codified at* 42 U.S.C. § 1988 (1988), Congress and the Supreme Court have made clear that the fee-shifting provisions of that statute and Title VII are to be interpreted alike. *See Hensley*, 461 U.S. at 433 n. 7, 103 S.Ct. at 1939 n. 7; S.Rep. No. 1011, 94th Cong., 2d Sess. 4 (1976), U.S.Code Cong. & Admin.News 1976, p. 5908.

at 896, 104 S.Ct. at 1547–48; *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 569, 106 S.Ct. 3088, 3100, 92 L.Ed.2d 439 (1986) (*"Delaware Valley I"*) (Blackmun, J., concurring in part and dissenting in part); *City of Riverside v. Rivera*, 477 U.S. 561, 586, 106 S.Ct. 2686, 2700, 91 L.Ed.2d 466 (1986) (Powell, J., concurring in the judgment). Under this standard of review, we are not to substitute our judgment of what is "reasonable" for that of the District Court; rather, we are to review the trial court's judgment only to ensure that it is not founded upon an error of law or a clearly erroneous finding of fact and that there is some evidence in the record upon which the court "rationally could have based its decision." *Heat & Control, Inc. v. Hester Indus., Inc.*, 785 F.2d 1017, 1022 (Fed.Cir. 1986); *see also Founding Church of Scientology of Washington, D.C., Inc. v. Webster*, 802 F.2d 1448, 1457 (D.C.Cir.1986) ("The abuse-of-discretion standard calls on the appellate department, in a spirit of humility occasioned by not having participated in what has gone before, not just to scrutinize the conclusion but to examine with care and respect the process that led up to it."), *cert. denied*, 484 U.S. 871, 108 S.Ct. 199, 98 L.Ed.2d 150 (1987); *Gomez v. Chody*, 867 F.2d 395, 405 (7th Cir.1989) (" 'To find an abuse of discretion, we must conclude that "no reasonable [person] ... could agree with the district court." ' ") (quoting *Mumford v. Bowen*, 814 F.2d 328, 329 (7th Cir.1986)).

Notwithstanding the latitude vested by Congress in trial courts to craft "reasonable" fee awards, the District of Columbia ("Government") defendants in this case urge this court to substitute its judgment for that of the trial judge in overturning the award of fees. In following this suggestion, the majority seizes upon the "substantial difficulties" test found in *Pennsylvania v. Delaware Valley Citizens' Council for Clear Air*, 483 U.S. 711, 731, 107 S.Ct. 3078, 3089–90, 97 L.Ed.2d 585 (1987) (*"Delaware Valley II"*); *id.* at 733, 107 S.Ct. at 3090–91 (O'Connor, J., concurring in part and concurring in the judgment), which purports to measure risk enhancement pursuant to prevailing "market" rates in the relevant legal community. The majority, however, turns the test on its head by converting it to a test whereby an individual plaintiff must establish that she personally encountered difficulty securing competent representation without the promise of a contingency enhancement. The problem with this result, however, is that it defies the premise upon which it is based. If there is a "substantial difficulties" requirement under section 706(k), it does *not* seek to determine whether a particular plaintiff "actually faced substantial difficulty in retaining counsel." *Morris v. American Nat'l Can Corp.*, 941 F.2d 710, 715 (8th Cir.1991) (citing *McKenzie v. Kennickel*, 875 F.2d 330, 337–38 (D.C.Cir.1989); *see* 875 F.2d at 338 ("Justice O'Connor's opinion instructs us to adopt a class-wide view of contingent cases; if the unavailability of risk enhancements would have caused plaintiffs to have experienced 'substantial difficulty' in locating counsel, then, notwithstanding the particular circumstances of their case, such an enhancement may be granted.")). Therefore, the trial judge surely did not abuse his discretion in failing to apply the majority's distorted construction of the so-called "substantial difficulties" test. There is no "actual difficulties" requirement under section 706(k), and this court has no authority to amend the statute to include such a restriction.

Just recently, in rejecting a claim for expert fees as a part of a claim for attorney's fees, the Supreme Court reminded us that we must enforce fee statutes as written. On this point, Justice Scalia, borrowing a well-known passage from an opinion by Justice Brandeis, said:

> [The statute's] language is plain and unambiguous. What the Government asks is not a construction of a statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope. To supply omissions transcends the judicial function.

*West Va. Univ. Hosps., Inc. v. Casey*, —— U.S. ——, 111 S.Ct. 1138, 1148, 113 L.Ed.2d 68 (1991) (quoting *Iselin v. United States*,

270 U.S. 245, 250–51, 46 S.Ct. 248, 250, 70 L.Ed. 566 (1926)). In first utilizing an actual difficulties gloss` to section 706(k), and then completely barring contingency enhancements, the majority opinion in this case "transcends the judicial function." Because there is nothing in the statute or the relevant Supreme Court case law that would support the majority's conclusion, we dissent.

## I.

By now, it should be beyond dispute that the fee-shifting provision of Title VII permits district courts to enhance time-based fee awards to take account of the fact that an attorney has taken a case on a contingent-fee basis. It is, of course, true that, in determining what is "a reasonable attorney's fee" in any given case, the trial judge normally begins by calculating the prevailing attorney's so-called "lodestar" fee. As the Supreme Court has explained:

> The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make *an initial estimate* of the value of a lawyer's services.

*Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939 (emphasis added). This calculation, however, is only a "starting point" and "does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward...." *Id.* at 434, 103 S.Ct. at 1940; *see also Blanchard v. Bergeron,* 489 U.S. 87, 94, 109 S.Ct. 939, 944–45, 103 L.Ed.2d 67 (1989); *Blum,* 465 U.S. at 888, 104 S.Ct. at 1544 ("[a]djustments to that [lodestar] fee then may be made as necessary in the particular case").

Among these "other considerations," it appears quite certain that Congress intended that the courts would take into account whether a lawyer had taken a case on a fixed- or contingent-fee basis. This can be inferred from Congress' approving citation of a 1974 Fifth Circuit decision, *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974), which included the contingent nature of payment among 12 factors that trial courts should consider in calculating fee awards. *See* S.Rep. No. 1011, 94th Cong., 2d Sess. 6 (1976); H.R.Rep. No. 1558, 94th Cong., 2d Sess. 8–9 (1976); *see also Blum,* 465 U.S. at 902–03, 104 S.Ct. at 1550–51 (Brennan, J., concurring) (Congress' approval of *Johnson* and related cases makes it "clear ... that Congress authorized district courts to award upward adjustments to compensate for the contingent nature of success"). *"Johnson's* 'list of 12,'" the Supreme Court has often observed, "provides a useful catalog of the many factors to be considered in assessing the reasonableness of an award of attorney's fees...." *Blanchard,* 489 U.S. at 93, 109 S.Ct. at 944; *see also Hensley,* 461 U.S. at 429–30, 434 n. 9, 103 S.Ct. at 1937–38, 1940 n. 9 (looking to Fifth Circuit's *Johnson* opinion in determining congressional intent with regard to fee awards); *Blum,* 465 U.S. at 893–95, 104 S.Ct. at 1546–47 (same); *id.* at 902–03, 104 S.Ct. at 1550–51 (Brennan, J., concurring) (same).

Apart from these indications of congressional intent, the Supreme Court also has acknowledged the propriety of considering the uncertainty of payment in calculating a fee award. Five Justices undoubtedly agreed in *Delaware Valley II* that "Congress did not intend to foreclose consideration of contingency in setting a reasonable fee under fee-shifting provisions" such as that found in Title VII. 483 U.S. at 731, 107 S.Ct. at 3089–90 (O'Connor, J., concurring in part and concurring in the judgment); *see also id.* at 739, 107 S.Ct. at 3093–94 (Blackmun, J., dissenting, joined by Brennan, Marshall & Stevens, JJ.) ("Congress envisioned that district courts would take the fact of contingency into account when calculating a reasonable attorney's fee"). Two years later, in *Blanchard,* the Court held that, while a plaintiff's contingent-fee contract with her attorney is by no means dispositive of a subsequent judicial assessment of "a reasonable attorney's fee" in a case, "[t]he *Johnson* contingency-fee factor *is* ... a factor." 489 U.S. at 93, 109 S.Ct. at 944 (emphasis added).

Moreover, perhaps the one rule that has emerged more clearly than any other from the Supreme Court's pronouncements in this area is that court-ordered attorney's fees are to reflect prevailing market rates and practices. *See, e.g., Missouri v. Jenkins*, 491 U.S. 274, 283, 109 S.Ct. 2463, 2469, 105 L.Ed.2d 229 (1989) ("Our cases have repeatedly stressed that attorney's fees awarded [by a court] ... are to be based on market rates for the services rendered."); *Blum*, 465 U.S. at 895, 104 S.Ct. at 1547 ("The statute and legislative history establish that 'reasonable fees' ... are to be calculated according to the prevailing market rates in the relevant community...."); *Delaware Valley II*, 483 U.S. at 733, 107 S.Ct. at 3090–91 (O'Connor, J., concurring in part and concurring in the judgment); *id.* at 754, 107 S.Ct. at 3101–02 (Blackmun, J., dissenting). In this way, court-ordered fees will track market forces, fulfilling the congressional purpose of ensuring that attorneys will be available to prosecute Title VII cases and vindicate the fundamental national policies embodied in that statute. *See Jenkins*, 491 U.S. at 283 n. 6, 109 S.Ct. at 2469 n. 6; *Blum*, 465 U.S. at 903–04, 104 S.Ct. at 1551 (Brennan, J., concurring); *Hensley*, 461 U.S. at 447, 103 S.Ct. at 1946–47 (Brennan, J., concurring in part and dissenting in part).

There should be no controversy in the observation that attorneys in the private legal-services market ordinarily demand somewhat greater compensation in exchange for taking a case on a contingent-fee basis. It appears indisputable that "[l]awyers operating in the marketplace can be expected to charge a higher hourly rate when their compensation is contingent on success than when they will be promptly paid[ ] irrespective of whether they win or lose." *Blum*, 465 U.S. at 903, 104 S.Ct. at 1551 (Brennan, J., concurring); *see also* Berger, *Court Awarded Attorneys' Fees: What Is "Reasonable"?*, 126 U.Pa.L.Rev. 281, 324–25 (1977) ("The experience of the marketplace indicates that lawyers generally will not provide legal representation on a contingent basis unless they receive a premium for taking that risk."). Thus, commentators and courts have long and widely

agreed that, in assessing the fair market value of legal services, both inside and outside the court-ordered fee context, some enhancement is required to compensate for the attorney's assumption of risk in a contingent-fee case. *See, e.g., Copeland v. Marshall*, 641 F.2d 880, 892–93 (D.C.Cir. 1980) (*en banc*); *id.* at 927 (Wilkey, J., dissenting); *Evans v. Sheraton Park Hotel*, 503 F.2d 177, 188 (D.C.Cir.1974) (adopting *Johnson*'s "list of 12"); 2 M. Derfner & A. Wolf, Court Ordered Attorney Fees ¶ 15.01[2][c], at 15–16 (rev. ed. 1990) ("Most courts realize that where payment of a fee is contingent on success an attorney should receive a larger overall fee than where payment is guaranteed regardless of outcome....") (footnote omitted); *id.*, ¶ 16.-04[4]; S. Speiser, Attorneys' Fees § 8:10, at 319 (1973) ("The fact that an attorney's employment is undertaken on a contingent basis is a proper factor to be considered in assessing a reasonable compensation for his services, the courts generally taking the view that a larger fee will be authorized where its payment depends upon the attorney's success than where he is to be paid whether or not his efforts are successful.") (footnote omitted); Leubsdorf, *The Contingency Factor in Attorney Fee Awards*, 90 Yale L.J. 473, 501 (1981); Berger, *supra*, at 324–26.

Furthermore, it is absolutely clear that the lodestar is not the sole measure of a reasonable attorney's fee. It is true that the Supreme Court has said that "many of the *Johnson* factors," such as " 'novelty [and] complexity of the issues,' 'the special skill and experience of counsel,' the 'quality of representation,' and the 'results obtained' from the litigation[,] are presumably fully reflected in the lodestar amount, and thus cannot serve as independent bases for increasing the basic fee award," *see Delaware Valley I*, 478 U.S. at 565, 106 S.Ct. at 3098 (quoting *Blum*, 465 U.S. at 898–900, 104 S.Ct. at 1548–1550); but, in making this observation, the Court has excluded the consideration of "enhancement of the lodestar[ ] based on the likelihood of success[ ] or ... the risk of loss" from any presumption that the lodestar represents a

reasonable fee, *id.* 478 U.S. at 568, 106 S.Ct. at 3099–3100.[2] Indeed, in *Delaware Valley I,* the Court reserved until *Delaware Valley II* the question of when and to what extent contingency enhancements might be awarded. As indicated earlier, a majority of the Court in *Delaware Valley II* agreed that contingency enhancements may be awarded as a part of a reasonable attorney's fee. In other words, a majority of the Court in *Delaware Valley II* declined to apply any "presumption" that the lodestar normally represents a reasonable fee so as to defeat claims of enhancement based on the likelihood-of-success/risk-of-loss factor.[3]

We recognize that the contingency factor could be accounted for within the initial lodestar calculation. A court could simply enhance the "reasonable" hourly rate used in calculating the lodestar and forgo post-lodestar adjustments. *See, e.g., Copeland,* 641 F.2d at 893 ("To the extent ... that an hourly rate underlying the 'lodestar' fee itself comprehends an allowance for the contingent nature of the availability of fees in Title VII litigation ..., no further adjustment duplicating that allowance will be made."); *Berger, supra,* at 325–26. This approach is problematic because there really is "no such thing as a market hourly rate in contingent litigation." 2 M. DERFNER & A. WOLF, *supra,* ¶ 16.04[4][a], at 16–100.15. Accordingly, most courts choose to employ "real" hourly rates in the lodestar calculation—*i.e.,* "the normal hourly charge in the community for noncontingent, contemporaneous payment in litigation of similar complexity and difficulty, by a lawyer with similar experience and reputation," *id.,* ¶ 16.03[1][a], at 16–47 (footnotes omitted)[4]—and only later adjust the product

upward to account for the contingency factor. *See id.,* ¶ 16.04[4][a], at 16–100.15–.16. The difference in the mathematical formulas makes no difference in the result, of course, so long as the court is careful to avoid "double-counting" by blending the two approaches. *See Copeland,* 641 F.2d at 893. The point here is, however, that under the approach followed by most courts—and followed by the District Court in this case—the contingency factor is *not* subsumed within the initial lodestar calculation; consequently, if the lodestar is not itself adjusted upward, the lawyer's economic risk will go uncompensated.

The majority rejects the prevailing view that enhancements are available because it can find no governing principle in *Delaware Valley II.* With no precedent or logic to support its opinion, the majority simply decides that contingency enhancements never should be permitted. This rule is created completely out of new cloth. Neither the plurality, concurring, nor dissenting opinion in *Delaware Valley II* holds that contingency enhancements are *never* available. In a sweep of reasoning that defies comprehension, the majority attempts to dismiss Part V of Justice White's plurality opinion because Justice O'Connor declined to join this portion of the plurality. But, of course, as is clear from the Court's opinion, Part V remains as written and means what it says: *see, e.g.,* 483 U.S. at 728, 107 S.Ct. at 3088 ("enhancement for the risk of nonpayment should be reserved for exceptional cases where the need and justification ... are readily apparent and are supported by evidence in the record and specific findings by the courts"); *id.* at 731, 107 S.Ct. at 3089–90 ("[A] fee award should

---

**2.** The Court reiterated the presumptive reasonableness of the lodestar fee in *Blanchard,* but did so there only to rebut the suggestion that a fee arrangement set in a contingent-fee contract should govern as a strict ceiling on a court-ordered fee in the same case. *See* 489 U.S. at 95, 109 S.Ct. at 945.

**3.** The majority's extended discussion of whether the five votes that adopt this position constitute a binding majority of the Court seems to us overly pedantic, and mostly irrelevant. It is axiomatic that lower court judges routinely con-

sider and weigh the diverse statements in Supreme Court opinions, especially those propositions garnering a majority, to seek guidance in the disposition of subsequent cases. Indeed, that is precisely what our sister circuits have done in construing *Delaware Valley II.*

**4.** The Supreme Court acknowledged as much in *Blanchard* when it stated that the lodestar figure is to be derived by "applying *prevailing billing rates* to the hours reasonably expended on successful claims." 489 U.S. at 94, 109 S.Ct. at 944 (emphasis added).

be informed by the statutory purpose of making it possible for poor clients with good claims to secure competent help. Before adjusting for risk assumption, there should be evidence in the record, and the trial court should so find, that without risk enhancement plaintiff would have faced substantial difficulties in finding counsel in the local or other relevant market."). Whatever substantive criteria these statements may stand for, they certainly do not reflect a *per se* rule against contingency enhancements. In any event, the one thing that is absolutely clear from *Delaware Valley II* is that the Supreme Court *declined* to reject the possibility of contingency enhancements.

Furthermore, the majority in this case, having decided that *Delaware Valley II* does not control interpretation of the fees statute, does absolutely no work to interpret the statute. Rather, the majority relies on the utterly irrelevant proposition that "the question of attorney's fees must not turn into major litigation itself," *see Delaware Valley II*, 483 U.S. at 722, 107 S.Ct. at 3085, to reach a *per se* rule barring all contingency enhancements. Of course, the majority's fear could be avoided equally well by routinely granting contingency enhancements. Even a test which looks to whether, in the relevant market, contingency fees are needed to induce attorneys to represent plaintiffs in these actions, will not create much hardship after district and circuit courts establish precedent regarding the major markets. Given that the contingency enhancement question merely asks the court to decide the prevailing market for legal services, it is no more onerous than any other fee inquiry.

The majority's result also flies in the face of the decisions from *every* circuit that has considered the issue since *Delaware Valley II*. In creating a split in the circuits, the majority now causes the D.C. Circuit to stand oddly alone on this question. Of the thirteen circuits applying *Delaware Valley II*, none—save the D.C. Circuit—has completely ruled out contingency enhancements. *See, e.g., Jacobs v. Mancuso*, 825 F.2d 559, 561 (1st Cir.1987) (disallowing contingency, not because of *per se*

rule, but because "liability here was so plain … that, as a practical matter, the risk of not recovering a fee was all but eliminated"); *Friends of the Earth v. Eastman Kodak Co.*, 834 F.2d 295, 298 (2d Cir.1987) (fee enhancement available when "[w]ithout the possibility of a fee enhancement … competent counsel might refuse to represent … clients thereby denying them effective access to the courts") (quoting *Lewis v. Coughlin*, 801 F.2d 570, 576 (2d Cir.1986)); *Kelly v. Matlack*, 903 F.2d 978 (3d Cir.1990) ("in order to qualify for an enhancement, a plaintiff must establish that without adjustment it would have faced substantial difficulties in finding counsel in the … relevant market") (citations omitted); *Craig v. Dep't of Health & Human Servs.*, 864 F.2d 324, 327 (4th Cir. 1989) (dicta) (reading *Delaware Valley II* to permit fees in "exceptional circumstances"); *Alberti v. Klevenhagen*, 896 F.2d 927, 936 (5th Cir.) (enhancement available when district court "make[s] the findings required by Justice O'Connor's concurrence in *Delaware Valley II*"), *reh'g granted in part*, 903 F.2d 352 (5th Cir. 1990); *Perotti v. Seiter*, 935 F.2d 761, 765 (6th Cir.1991) ("This court has upheld multipliers for the risk of non-compensation in contingent-fee cases subsequent to *Delaware Valley*.") (citing *Fite v. First Tennessee Production Credit Ass'n*, 861 F.2d 884 (6th Cir.1988)); *Soto v. Adams Elevator Equip. Co.*, 941 F.2d 543, 553 (7th Cir.1991) (following Justice O'Connor's test as the *Delaware Valley II* "holding"); *Morris v. American Nat'l Can Corp.*, 941 F.2d 710, 715 (8th Cir.1991) ("Justice O'Connor's opinion in *Delaware Valley II* is the current legal standard for awarding contingency enhancements.… We are persuaded that the district court abused its discretion in concluding that [plaintiff] failed to establish that she would have faced substantial difficulties in retaining counsel absent risk enhancement."); *Bouman v. Block*, 940 F.2d 1211, 1235–36 (9th Cir.1991) (upholding fee on the basis of district court's findings matching Justice O'Connor's test), *cert. denied*, —— U.S. ——, 112 S.Ct. 640, 116 L.Ed.2d 658 (1991);

*Smith v. Freeman,* 921 F.2d 1120, 1123 (10th Cir.1990) (quoting the *Delaware Valley II* plurality that "enhancement for the risk of non-payment should be reserved for exceptional cases where the need and justification for such enhancement are readily apparent and are supported by evidence in the record and specific findings by the courts"); *Martin v. University of South Alabama,* 911 F.2d 604, 610–12 (11th Cir. 1990) (following Justice O'Connor's test); *Crumbaker v. Merit Systems Protection Board,* 827 F.2d 761, 761 (Fed.Cir.1987) ("the Board on remand shall consider the degree to which the relevant market compensates for contingency and whether any enhancement is necessary to bring the fee within a range that would attract competent counsel").

Additionally, despite the majority's assertion that the tests developed in many circuits are "difficult, if not impossible, to meet," even courts of those circuits have continued to award contingency enhancements in some circumstances. *See, e.g., Morris v. American Nat'l Can Corp.,* 941 F.2d 710, 716 n. 2 (8th Cir.1991); *Curry v. Contract Fabricators Inc. Profit Sharing Plan,* 891 F.2d 842, 849–50 (11th Cir.1990); *Shirley v. Chrysler First, Inc.,* 763 F.Supp. 856, 860 (N.D.Miss.1991); *Vargas v. Calabrese,* 750 F.Supp. 677 (D.N.J.1990); *Bauman v. Jacobs Suchard, Inc.,* No. 89 C 5452, 1991 WL 125952, 1991 U.S. Dist. LEXIS 8847 (N.D.Ill.1991).

Thus, setting aside the more contentious question of what degree of enhancement is appropriate, there ought to be no dispute that *some* upward adjustment of the lodestar fee is permissible where the prevailing attorney assumed the greater risk inherent in contingent-fee cases. There is simply no justification—in the statute, in the case law or in common sense—for the suggestion that contingent-fee lawyers may not be fully compensated for their services.

## II.

With regard to the particular facts of this case, there is no basis under the abuse-of-discretion standard of review to overturn the District Court's decision to allow a 50% enhancement of the lodestar fee submitted by Ms. King's counsel. Although the Supreme Court's guidance concerning the appropriate method for *calculating* a contingency adjustment has been regrettably uncertain, the trial court's decision in this case is consistent with what standards can be gleaned from recent cases.

The clearest instruction found in the Supreme Court's cases is that fee awards must be tied to evidence of the fee practices prevailing in the local legal market. *See, e.g., Jenkins,* 491 U.S. at 283, 285, 109 S.Ct. at 2469; *Blum,* 465 U.S. at 894–95, 104 S.Ct. at 1546–47; *Delaware Valley II,* 483 U.S. at 733, 107 S.Ct. at 3090–91 (O'Connor, J., concurring in part and concurring in the judgment); *id.* at 754, 107 S.Ct. at 3101–02 (Blackmun, J., dissenting). That was done in this case. In reaching its determination, the District Court expressly relied upon attorney affidavits filed by the plaintiff and an earlier decision in the same district in which another trial judge had found that "attorneys in the Washington[,] D.C.[,] community will only accept a fully contingent case if their recovery will be at least double their normal hourly billing rate and will only accept a partially contingent case if their recovery is enhanced by at least 50 percent." *See Palmer v. Shultz,* 679 F.Supp. 68, 74 (D.D.C.1988), *quoted in King v. Palmer,* Civ. Action No. 83–1980, mem. op. at 4, 1988 WL 104970 (D.D.C. Sept. 20, 1988).

Another way to assess the reasonableness of the fee amount awarded by the District Court is pursuant to the two-prong test set forth in Justice O'Connor's concurring opinion in *Delaware Valley II.* Although it is unclear what precedential force that opinion should be given, *cf. Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993–94, 51 L.Ed.2d 260 (1977), it is nonetheless a source of some guidance and it is further indication that the judgment of the District Court should be affirmed in this case. Under the first prong of Justice O'Connor's test, lower courts would be required to "treat a determination of how a particular market compensates for contingency as controlling future cases involving

the same market." 483 U.S. at 733, 107 S.Ct. at 3090 (O'Connor, J., concurring in part and concurring in the judgment). Under the second prong, "the fee applicant bears the burden of proving the degree to which the relevant market compensates for contingency." *Id.* Under this second prong, "no enhancement for risk is appropriate unless the applicant can establish that without an adjustment for risk the prevailing party 'would have faced substantial difficulties in finding counsel in the local or other relevant market.'" *Id.* (quoting from plurality opinion, 483 U.S. at 731, 107 S.Ct. at 3089).

Under the first prong of Justice O'Connor's test, the District Court here reasonably concluded that "the relevant market" does in fact compensate lawyers for assuming the risk of contingent payment. In addition to the evidence cited in *Palmer v. Shultz*, which went directly to the degree to which the Washington, D.C., legal market customarily compensates for contingency, the court had before it several dozen affidavits from local attorneys swearing either that they generally demand an enhancement over normal hourly rates in order to accept contingent-fee cases or that they refuse such cases altogether because of the risk involved.

Under the second prong of Justice O'Connor's test, Ms. King was required to show that she "would have faced substantial difficulties in finding counsel" had contingency enhancements *not* been customarily available in the Washington, D.C., legal market. This proposition, of course, turning as it does on a counterfactual supposition, is difficult to prove. Nonetheless, Ms. King produced an affidavit from her attorney stating that he would not have taken her case without the prospect of a fee enhancement. *See* Declaration of Robert M. Adler at 2 (Sept. 11, 1987), *reprinted in* Joint Appendix ("J.A.") 74, 75. In addition, she produced further affidavits from several Washington, D.C., Title VII plaintiffs' attorneys corroborating that Ms. King likely would have faced substantial difficulties securing counsel without the promise of a contingency premium.[5] These attestations were reinforced by others documenting the general unwillingness of local attorneys to accept such cases absent some likelihood of receiving an enhancement for risk. On this record, we believe that Ms. King carried her burden under both prongs of Justice O'Connor's test.

Because Title VII and the governing case law clearly permit trial courts to enhance attorney's fees to compensate for the risk of contingent payment, and because the facts of the instant case satisfy whatever standards can be gleaned from recent Supreme Court cases, it cannot be found that the District Court abused its discretion in shaping the fee award in this case. As we noted at the outset, the standard of review in this case is *abuse of discretion*. The majority, however, has simply ignored the constraints of appellate review in second-guessing the findings of the trial judge. Indeed, the majority's approach in this case borders on *de novo* review, in flat defiance of the Supreme Court's instruction that "[i]t is central to the awarding of attorney's fees ... that the district court judge,

---

5. In one affidavit, attorney George Chuzi stated:

During 1983, I was personally familiar with most of the attorneys regularly bringing Title VII suits in the District of Columbia on behalf of plaintiffs. Had Mr. Adler not agreed to represent Mrs. King in this case, I am unaware of any other Title VII attorney who would have agreed in 1983 to represent her on a contingency fee basis (even had she agreed to pay up to $5,000 in legal fees). The only way in which I believe that a competent Title VII attorney would have been convinced to seriously consider this representation was if there was a reasonable possibility of receiving an enhanced fee for risk (over and above hourly rates) if Mrs. King prevailed.

Supplemental Declaration of George M. Chuzi at 2 (Dec. 21, 1987), *reprinted in* J.A. 130, 131; *see also* Declaration of David R. Cashdan at 4 (Apr. 25, 1986) ("I believe that it is highly unlikely that I would have agreed to act as sole counsel in this case."), *reprinted in* J.A. 112a, 112b; Declaration of Robert B. Fitzpatrick at 2 (Apr. 24, 1986) ("I believe that the chances of prevailing in this case ... were so remote that my firm would not have accepted representation of Mrs. King."), *reprinted in* J.A. 173a, 173b; Declaration of Barry H. Gottfried at 2 (July 31, 1987) ("Had the plaintiff sought to retain me to represent her by filing a suit for the claims involved herein I do not believe that I would have accepted representation."), *reprinted in* J.A. 176, 177.

in his or her good judgment, make the assessment of what is a reasonable fee under the circumstances of the case." *Blanchard,* 489 U.S. at 96, 109 S.Ct. at 946.

### III.

The fundamental problem with this case, as with other fee cases, is that the Supreme Court has yet to give us coherent guidance about how to determine the reasonableness of fee awards under Title VII and similar fee-shifting statutes. In this, we share the majority's frustration, if not its solution. In particular, we do not yet know under what circumstances to award a contingency enhancement, nor do we know whether the degree of enhancement allowed by the courts merely *reflects* prevailing market rates or actually *creates* the relevant market forces by defining the extent to which economic risk will be compensated.[6] In our view, the proper answers to these questions ultimately must come from Congress.

Logically, of course, the size of a contingency enhancement should be determined in each case according to the degree of risk actually incurred by the prevailing attorney. It is impossible to determine with any confidence what a "reasonable fee" would be in any particular contingency case without first assessing just how much risk the plaintiff's lawyer actually assumed.[7] *See, e.g.,* S. SPEISER, *supra,* § 8:10, at 320; Ber-

ger, *supra,* at 326. In this regard, the Court's apparent disapproval of case-by-case risk assessment, *see Delaware Valley II,* 483 U.S. at 731, 107 S.Ct. at 3089–90 (O'Connor, J., concurring in part and concurring in the judgment); *id.* at 745–46, 107 S.Ct. at 3097–98 (Blackmun, J., dissenting), serves only to frustrate the lower courts as they struggle to shape fee awards that, consistent with legislative purpose, will be "adequate to attract competent counsel" while stopping short of "produc[ing] windfalls" for plaintiffs' lawyers, *see Blum,* 465 U.S. at 897, 104 S.Ct. at 1548 (quoting S. REP. No. 1011, 94th Cong., 2d Sess. 6 (1976)).

Although we share Justice O'Connor's concern that risk enhancements not be calculated or awarded in "an arbitrary or unjust" manner, *Delaware Valley II,* 483 U.S. at 732, 107 S.Ct. at 3090 (O'Connor, J., concurring in part and concurring in the judgment), our experience suggests that the two-prong test enunciated in the concurring opinion in *Delaware Valley II* cannot be applied without difficulty. The panel opinions in this case and in *McKenzie v. Kennickell,* 875 F.2d 330 (D.C.Cir.1989), illustrate the two dilemmas inherent in this test. First, although the affidavits in both cases clearly establish that lawyers routinely demand the equivalent of a significantly higher hourly fee if they accept a case on a contingent-fee basis, those same

---

6. For example, as Judge Williams has pointed out, if courts generally allow a contingency enhancement of 50%, lawyers will have an economic incentive to bring only those cases in which the odds of succeeding on the merits are at least two-to-one; if the court-ordered enhancement figure rises to 100%, lawyers will presumably bring any case in which the chances of winning are at least 50%. *See King v. Palmer,* 906 F.2d 762, 770 (D.C.Cir.) (Williams, J., concurring in panel decision), *vacated & reh'g en banc granted,* 906 F.2d 772 (D.C.Cir.1990).

7. In this respect, a risk enhancement arguably should not encompass hours of labor for which compensation was secure. In the instant case, the argument could well be made that the risk of nonpayment incurred by Ms. King's counsel virtually vanished after this court decided the merits in Ms. King's favor in 1985. In *King v. Palmer,* 778 F.2d 878 (D.C.Cir.1985), this court reversed the District Court's entry of judgment

for the defendants and remanded the matter with instructions "to enter judgment for Ms. King and to determine an appropriate remedy." *Id.* at 882 (footnote omitted). "At a minimum," we noted, "it appears that the appropriate remedy in this case should include the promotion of Ms. King ..., her receipt of back pay, and a full consideration of any further relief." *Id.* at 882 n. 7. Once Ms. King prevailed on the merits of her main claim, the defendants recognize, she qualified for an award of fees for "hours reasonably expended [thereafter] on remedial and similar ancillary matters." *See* Brief for Appellees/Cross–Appellants at 39. At least once it was established that there would be no review of the merits in the Supreme Court, there remained no risk of nonrecovery. Accordingly, the District Court probably could have, within the bounds of its discretion, eliminated from the risk-enhancement calculation fees for post–1985 work for which lodestar payment was certainly due.

affidavits also demonstrate that there is no one "market rate" or contingency fee arrangement for all such cases.[8] Instead, lawyers predictably evaluate the case of each potential client independently and decide whether to accept representation and what to charge based on their estimation of the likelihood of success and the amount of fees they will receive if they do, in fact, prevail.[9] Consequently, it is arguably unrealistic to assume that a court can determine one specific level of enhancement that the market demands in contingent-fee cases "as a class."

Second, the so-called "substantial difficulties" test is a confusing and potentially mischievous requirement. For example, the requirements that the court determine the amount of enhancement by looking at contingency cases as a class, and that it look at the circumstances of the particular case only to determine if the plaintiff would have had substantial difficulty in obtaining counsel without the enhancement, force trial judges to award contingency enhancements on an all-or-nothing basis. The judge must either award the supposed "market" risk enhancement or no enhancement at all; there is no leeway for the court to decide that some enhancement is appropriate, but that it should be less than the previously determined "market" rate. Although the awards calculated by this method are concededly uniform, they may be nonsensical insofar as they overcompensate some plaintiffs with not-so-risky cases while inadequately compensating others with especially risky ones.

Consequently, we believe that district judges, in enhancing the lodestar to account for the risk of nonpayment, should have the same discretion that they have in determining other components of the reasonable fee. Although no one formula can

be devised for all cases, we think that district courts should consider both the size of the attorney's investment in the case and the likelihood that that investment would not be recouped. For one thing, in determining whether a contingency enhancement is necessary to enable the plaintiff to secure counsel, the court could consider the amount that the lawyer would lose if the plaintiff did not prevail. *See Delaware Valley II*, 483 U.S. at 747–48 & n. 12, 107 S.Ct. at 3098 & n. 12 (Blackmun, J., dissenting); *Wildman v. Lerner Stores Corp.*, 771 F.2d 605, 613–14 (1st Cir.1985). The court thus might consider factors such as

> what, if any, payment the attorneys would have received had the suit not been successful; what, if any, costs or expenses the attorneys would have incurred if the case had been lost; the extent to which the attorneys were required to compensate associates and to carry overhead expenses without assurance of compensation; and whether other attorneys refused to take the case because of the risk of nonpayment.

*Delaware Valley II*, 483 U.S. at 748 n. 12, 107 S.Ct. at 3098 n. 12 (Blackmun, J., dissenting). In our view, contingency enhancements are appropriate if the lawyer has to expend a substantial amount of her time and resources to litigate a case and there is a significant risk of not prevailing (and thus of not recouping her investment).

For another thing, the court could consider the plaintiff's likely "ability to prove liability and damages ... [and the legal precedent] either in favor of or against the theories put forth in the case" in order to determine the magnitude of the risk that the plaintiff would not prevail. *See Wildman*, 771 F.2d at 612. We recognize that

---

**8.** To the contrary, lawyers claimed to demand contingency enhancements from 33% to 300% of their regular hourly rates. Other lawyers did not specify a percentage, saying only that they needed a "reasonable" risk enhancement to accept a Title VII case on a contingent basis.

**9.** As a result, the lawyer and client may tailor the terms of the contract to address the risks and potential rewards involved in each case. *See, e.g.,* Declaration of Nora A. Bailey at 2

(Aug. 12, 1987), *reprinted in* J.A. 82, 83; Declaration of John R. Erickson at 2 (Nov. 16, 1987), *reprinted in* J.A. 168, 169; Declaration of Chester T. Kamin at 2–3 (Aug. 24, 1987), *reprinted in* J.A. 193, 194–95; Affidavit of David N. Webster at 6 (Sept. 20, 1982) ("The greater the uncertainty of result, the greater the percentage fee may be, albeit always within the limit of reasonableness."), *reprinted in* J.A. 289, 294.

it is impossible to determine such risk with any mathematical precision, and we are cognizant of the supposed ethical tensions such calculations may engender,[10] but we do think that a district court judge, who is familiar with the factual and legal development of the case, can differentiate—after the fact—among cases based on the probability of success in the beginning. As the plurality in *Delaware Valley II* recognized, in some cases there is very little risk of not prevailing, and no enhancement for contingency, or only a very small one, should be awarded.[11] In other cases, the risk of not prevailing would be substantial and the enhancement should be correspondingly enlarged.[12]

In the absence of further guidance in this area from Congress or the Supreme Court, however, we would adhere to the only secure legislative directive available to us—that assessments of what constitutes a "reasonable attorney's fee" are to be left to the sound and reasoned discretion of trial judges. A decade ago, this court, sitting *en banc*, acknowledged the inherent lack of certainty in this enterprise but concluded that such determinations were nonetheless best left, as Congress intended, with trial judges:

> To the district court judge falls the task of calculating as closely as possible a contingency adjustment with which fairly to compensate the successful attorney. We have not … lost sight of the fact that this adjustment is inherently imprecise and that certain estimations must be made. For example, it is difficult in hindsight to determine the risk of failure at the commencement of a lawsuit that ultimately proved to be successful. Thus, we ask only that the district court judges exercise their discretion as conscientiously as possible, and state their reasons as clearly as possible.

*Copeland,* 641 F.2d at 893 (footnote omitted).[13] We can perceive no reason to de-

---

**10.** The plurality summarized these concerns in *Delaware Valley II:*

> [E]valuation of the risk of loss creates a potential conflict of interest between an attorney and his client, for in order to increase a fee award, a plaintiff's lawyer must expose all of the weaknesses and inconsistencies in his client's case, and a defendant's attorney must either concede the strength of the plaintiff's case in order to keep down the fee award, or "allo[w] the fee to be boosted by the contingency bonus [by] insisting that the plaintiff's victory was freakish."

483 U.S. at 721–22, 107 S.Ct. at 3084–85 (quoting Leubsdorf, *supra,* at 483). The latter of these concerns is, of course, not an attorney-client conflict at all, but simply a strategic dilemma for the defendant of the sort that is not unknown in litigation. To the extent that the first represents a genuine potential for attorney-client conflict, we are reassured by the confidence the Supreme Court has previously expressed for lawyers' ability to put their clients' interests ahead of their own. *See Evans v. Jeff D.,* 475 U.S. 717, 727–28, 106 S.Ct. 1531, 1537–38, 89 L.Ed.2d 747 (1986) ("Although respondents contend that Johnson, as counsel for the class, was faced with an 'ethical dilemma' when petitioners offered him relief greater than that which he could reasonably have expected to obtain for his clients at trial (if only he would stipulate to a waiver of the statutory fee award), and although we recognize Johnson's conflicting interests between pursuing relief for the class and a fee for the Idaho Legal Aid Society, we do not believe that the 'dilemma' was an 'ethical' one in the sense that Johnson had to choose between conflicting duties under the prevailing norms of professional conduct. Plainly, Johnson had no *ethical* obligation to seek a statutory fee award. His ethical duty was to serve his clients loyally and competently.") (footnote omitted; emphasis in original). If a lawyer can be trusted to serve his client faithfully at the cost of his entire statutory fee award, we feel sure he can be trusted to do so at the cost of some potential diminution of it.

**11.** The plurality in *Delaware Valley II* voted to reverse the 50% risk enhancement of lodestar fees incurred to enforce a consent decree in part because there was not "a real risk of not persuading the District Court to enforce its own decree." 483 U.S. at 730, 107 S.Ct. at 3089.

**12.** In saying that the district court should have the discretion to tailor the contingency enhancement to the particular case, we are not saying that the experience of other similarly situated plaintiffs can be disregarded. To the contrary, we think that the success rate of other plaintiffs who have filed suits based on similar legal theories is a good indicator of the risk presented in the case.

**13.** The court further observed:

> The setting of contingency adjustments is particularly within the expertise of the District Judge. As the Supreme Court said long ago, the District Court "has far better means of knowing what is just and reasonable than an appellate court can have." *Trustees v.*

part from that conclusion today. Because we discern nothing in the District Court's judgment that would suggest an abuse of discretion justifying reversal, and nothing at all supporting the majority's new legal rule, we dissent.

*Greenough,* 105 U.S. 527, 537, 26 L.Ed. 1157 (1882).

*Copeland,* 641 F.2d at 893 n. 24.